**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| JOHN DOE, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:26-cv-01541-AJT-IDD |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| *et al.,* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS</u>

Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
(202) 955-1974
(703) 918-4018 (facsimile)
srewari@hunton.com

David M. Parker (VSB No. 85619)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
(804) 788-8718
(804) 788-8218 (facsimile)
dparker@hunton.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 2

    I.    Factual background ................................................................................................ 2

        A.   The parties ........................................................................................................ 2

        B.   Plaintiffs film a mock-kidnapping video on school grounds. ......................... 3

        C.   Plaintiffs' mock-kidnapping video prompts "hysteria" that "quickly ma[kes] its way to the FCPS community." .................................................................... 5

        D.   AP Fawsett investigates and disciplines the eight students involved, including Plaintiffs. .................................................................................................... 6

    II.   Procedural history ................................................................................................ 8

ARGUMENT ......................................................................................................................... 9

    I.    Plaintiffs fail to state an Equal Protection claim. ................................................. 9

        A.   Plaintiffs were not treated differently from any similarly situated students. ................. 10

        B.   Plaintiffs fail to plead that any discipline was the product of discriminatory intent. .... 13

    II.   Plaintiffs fail to state a Title VI claim. ................................................................ 17

    III.  Plaintiffs fail to state a First Amendment claim. ................................................ 17

    IV.  Plaintiffs fail to state a procedural due process claim. ....................................... 19

        A.   Plaintiffs received due process for their short-term in-school suspensions. ................. 20

        B.   Plaintiffs fail to state a stigma-plus claim. .................................................... 23

    V.   Plaintiffs' claims must be dismissed against multiple Defendants and certain forms of relief on technical grounds. ............................................................................ 25

        A.   Black-letter law requires dismissal of claims against certain parties. ......................... 25

        B.   All claims against Superintendent Reid and Principal Mukai must be dismissed for lack of personal involvement. ............................................................. 26

        C.   Plaintiffs' claims for money damages against AP Fawsett are barred by qualified immunity. ............................................................................................... 27

        D.   All three constitutional claims against the School Board must be dismissed under *Monell*. ............................................................................................ 29

CONCLUSION ..................................................................................................................... 30

CERTIFICATE OF SERVICE ............................................................................................. 32

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Pastides*,
900 F.3d 160 (4th Cir. 2018) ................................................................................... 29

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .................................................................................................. 17

*Aljizzani v. Middle E. Broad. Networks, Inc.*,
178 F.4th 863 (4th Cir. 2026) ................................................................................... 11

*Allen v. Dorchester Cnty.*,
No. ELH-11-01936, 2013 WL 5442415 (D. Md. Sept. 30, 2013) ............................ 12

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ........................................................................................ 27, 28, 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................... 9, 24, 26, 27

*Awrey v. Gilbertson*,
833 F. Supp. 2d 738 (E.D. Mich. 2011) .................................................................... 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................... 9

*Callum v. CVS Health Corp.*,
137 F. Supp. 3d 817 (D.S.C. 2015) ........................................................................... 26

*Carroll v. Town of Univ. Park*,
12 F. Supp. 2d 475 (D. Md. 1997) ............................................................................. 24

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
68 F.4th 864 (4th Cir. 2023) ...................................................................................... 16

*Davenport v. Casteen*,
878 F. Supp. 871 (W.D. Va. 1995) ........................................................................ 23, 24

*Doe v. Fairfax Cnty. Sch. Bd.*,
403 F. Supp. 3d 508 (E.D. Va. 2019) .............................................................. 10, 21, 22

*Goines v. Valley Cmty. Servs. Bd.*,
822 F.3d 159 (4th Cir. 2016) ............................................................................. 3, 6, 7, 8

*Goss v. Lopez*,
419 U.S. 565 (1975) ............................................................................................. 20, 21

*Graham v. Animas Sch. Dist.*,
No. CV 07-1057 BB/WPL, 2008 WL 11412139 (D.N.M. Jan. 30, 2008) ................. 20

*Hardwick ex rel. Hardwick v. Heyward*,
711 F.3d 426 (4th Cir. 2013) ........................................................................... 18, 19, 23

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ............................................................................................ 28

*Herron v. Va. Commonwealth Univ.,*
  366 F. Supp. 2d 355 (E.D. Va. 2004) ................................................................. 11

*Katti v. Arden,*
  161 F.4th 217 (4th Cir. 2025) .......................................................................*passim*

*Kentucky v. Graham,*
  473 U.S. 159 (1985) ............................................................................................ 25

*King v. Riley,*
  76 F.4th 259 (4th Cir. 2023) ............................................................................... 27

*Laney v. Farley,*
  501 F.3d 577 (6th Cir. 2007) .............................................................................. 20

*Love-Lane v. Martin,*
  355 F.3d 766 (4th Cir. 2004) .............................................................................. 25

*Lynch v. Beaufort Cnty.,*
  No. 9:24-CV-03193-DCN-KFM, 2025 WL 4483957 (D.S.C. May 8, 2025) ........................... 24

*Lytle v. Doyle,*
  326 F.3d 463 (4th Cir. 2003) .............................................................................. 29

*Mahanoy Area Sch. Dist. v. B.L.,*
  594 U.S. 180 (2021) ............................................................................................ 17

*Mason v. Bd. of Educ.,*
  No. WMN-10-3143, 2011 WL 89998 (D. Md. Jan. 11, 2011) .................................... 20

*McDougal-Wilson v. Goodyear Tire & Rubber Co.,*
  427 F. Supp. 2d 595 (E.D.N.C. 2006) ................................................................. 11

*Misjuns v. City of Lynchburg,*
  139 F.4th 378 (4th Cir. 2025) ............................................................................. 30

*Monell v. Department of Social Services of City of New York,*
  436 U.S. 658 (1978) ............................................................................................ 29

*Morris v. City of Danville,*
  744 F.2d 1041 (4th Cir. 1984) ............................................................................ 22

*Morrison v. Garraghty,*
  239 F.3d 648 (4th Cir. 2001) ......................................................................... 10, 17

*Mullenix v. Luna,*
  577 U.S. 7 (2015) ................................................................................................ 28

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.,*
  354 F.3d 249 (4th Cir. 2003) ......................................................................... 17, 19

*Nordlinger v. Hahn,*
  505 U.S. 1 (1992) .................................................................................................. 9

iv

*Paul v. Davis*,
424 U.S. 693 (1976) ..............................................................................................23

*Pearson v. Callahan*,
555 U.S. 223 (2009) ..............................................................................................28

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ..............................................................................................13

*Peters v. Jenney*,
327 F.3d 307 (4th Cir. 2003) ................................................................................17

*Quinn v. Shirey*,
293 F.3d 315 (6th Cir. 2002) ................................................................................23

*Reading v. N. Hanover Twp.*, 1:23-CV-1469 (KMW-SAK),
2026 WL 102849 (D.N.J. Jan. 13, 2026) *appeal docketed*, No. 26-1963, (3d Cir. Apr. 28, 2026)........................................................................................................................27

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) ..............................................................................................17

*Ridpath v. Bd. of Governors Marshall Univ.*,
447 F.3d 292 (4th Cir. 2006) ................................................................................23

*Rogosin v. Mayor, City Council of Baltimore*,
197 F. Supp. 2d 345 (D. Md. 2002)......................................................................24

*Spell v. McDaniel*,
824 F.2d 1380 (4th Cir. 1987) ..............................................................................30

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*,
28 F.4th 529 (4th Cir. 2022) .................................................................................29

*Sylvia Dev. Corp. v. Calvert Cnty.*,
48 F.3d 810 (4th Cir. 1995) ..................................................................... 14, 15, 16

*Tinker v. Des Moines Independent Community School District*,
393 U.S. 503 (1969) ..........................................................................................9, 17

*Velez v. Levy*,
401 F.3d 75 (2d Cir. 2005) ...................................................................................25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ..........................................................................................13, 14

*Vinnedge v. Gibbs*,
550 F.2d 926 (4th Cir. 1977) ................................................................................26

*Walker v. Prince George's Cnty.*,
575 F.3d 426 (4th Cir. 2009)................................................................................29

*Wise v. Pea Ridge Sch. Dist.*,
855 F.2d 560 (8th Cir. 1988)................................................................................20

*Wofford v. Evans*,
390 F.3d 318 (4th Cir. 2004) ................................................................................21

## Statutes

42 U.S.C. § 1983................................................................................................................... 8
42 U.S.C. § 2000d................................................................................................................ 26
Va. Code § 22.1-71 ............................................................................................................... 3
Va. Code § 22.1-279.6(B)..................................................................................................... 30

## Rules

Fed. R. Civ. P. 12(b)(6)......................................................................................................... 2

**INTRODUCTION**

Plaintiffs, four current or former students at Thomas Jefferson High School for Science and Technology ("TJHSST"), filed this lawsuit challenging the school-based discipline they received in fall 2025, after they posted a video on social media that their school administrator determined violated the code of student conduct.  In the video, which Plaintiffs filmed on school grounds and during school hours, they pretended to hood and kidnap students who declined to attend a meeting of a school-sponsored club.  Plaintiffs also used props and displayed a political symbol associated with the October 7 attack on Israel and the ongoing war in Gaza.  Plaintiffs posted the video on their school club's Instagram page on a Friday.  It went viral over the weekend and generated, in Plaintiffs' own words, "hysteria" that "quickly made its way to the FCPS [Fairfax County Public Schools] community."  Compl. ¶ 90.

Plaintiffs allege that they didn't intend to evoke the October 7 attack or the war in Gaza, or to make any political statement whatsoever—they were just making a "joke" and a "comedy skit" inspired by a social-media trend.  But many students, parents, and community groups saw it otherwise.  They complained that the video was violent and distressing.  Many saw it as mocking the kidnapping of Jewish hostages.  Plaintiffs allege that this overwhelming reaction prompted TJHSST administration into action.  After an investigation, the associate principal issued each of the eight students involved in the video, including the four Plaintiffs, one week of in-school suspension.  She also asked one Plaintiff not to wear to school the sweatshirt that he wore in the video depicting a map of modern-day Israel covered by the Palestinian flag.  Plaintiffs now claim that she, as well as the school principal, the Division Superintendent, and the School Board all violated their First and Fourteenth Amendment rights, along with Title VI.

Plaintiffs' claims fail as a matter of law.  It does not matter whether Plaintiffs intended their video as a harmless "joke."  Nor does it matter whether the outcry that their video generated

was justified. Rather, Plaintiffs must show that their school's discipline was unlawfully discriminatory or unconstitutional. And even accepting all of Plaintiffs' factual allegations as true, it was not. Plaintiffs received in-school suspensions because they made a video, during school hours and in the school building, that mocked violence and that, by their own allegations, distressed many people, including students and parents at their school. That wasn't discrimination "because of" Plaintiffs' race, religion, or national origin. And it didn't violate the Plaintiffs' freedom of speech. Instead, it was a valid exercise of a school's authority to regulate in-school student conduct that disrupts the educational process. The Court should dismiss the Complaint.

## STATEMENT OF FACTS

Unless otherwise noted, the following facts are drawn from the allegations of Plaintiffs' Complaint and are assumed true solely for purposes of this motion. *See* Fed. R. Civ. P. 12(b)(6).

### I.    Factual background

#### A.    The parties.

Plaintiffs are four current or former TJHSST students among a group of eight students who were disciplined in connection with a video posted to the social media account of the school's Muslim Student Association ("MSA"). Compl. ¶ 7. The MSA is a national, student-led organization with chapters across the country. *Id.* ¶ 22. When this case was filed in June, Plaintiff John Doe was a senior and the President of the TJHSST MSA chapter. *Id.* ¶¶ 7; 28. Plaintiffs Jane Doe, Richard Roe, and Colin Coe were also members of the TJHSST MSA. *Id.* ¶¶ 8–10. Jane and Richard were juniors, while Colin was a sophomore. *Id.* ¶¶ 34; 40; 47.

The Fairfax County School Board (the "School Board"), which is misidentified in the complaint as "School Board for Fairfax County Public Schools," is a body politic that controls, supervises, and manages FCPS. *Id.* ¶ 11. Defendant Michelle C. Reid is the Superintendent of FCPS, *id.* ¶ 13, Defendant Michael Mukai is the Principal of TJHSST, *id.* ¶ 14, and Defendant

-2-

Elizabeth Fawsett is the Associate Principal ("AP") of TJHSST, *id.* ¶ 15.[1]

### B.   Plaintiffs film a mock-kidnapping video on school grounds.

During the Fall 2025 semester, Plaintiffs sought to increase attendance at MSA meetings and identified their school club's Instagram page as an effective recruiting tool. *Id.* ¶¶ 51–52. To that end, they filmed a video designed to draw attention to their school club and encourage other students to attend their meetings. *Id.* ¶ 51. Defendants are providing a copy of the full video on a thumb drive as a sealed exhibit to this motion.[2]

Plaintiffs filmed this video in TJHSST's "prayer room," which is in the school building, during the lunch period on Thursday, October 23, 2025. Compl. ¶ 62. The video begins with Plaintiff Jane Doe asking two students if they will attend an upcoming MSA meeting. Ex. 1 at 0:00:01–06. When those students refuse, Plaintiffs John Doe and Richard Roe promptly enter the scene from behind a black curtain. *Id.* at 0:00:06–08; Compl. ¶¶ 63–64. They "pretend to sneak up" on the two students who refused and "grab them." Ex. 1 at 0:00:08–10; Compl. ¶ 64. John Doe is wearing ordinary gym clothes, while Richard Roe is wearing a sweatshirt with a "Crescent Moon and Star symbol" and a keffiyeh. Ex. 1 at 0:00:08; 0:00:14–16; Compl. ¶ 77.

In the mock "kidnapping," Richard Roe pulls a keffiyeh over the first student's head and face and drags him behind a black screen, as one of the students cries out. Ex. 1 at 0:00:09–11. John Doe simultaneously grabs the second student from behind and stuffs him into a large plastic

---

[1] Ms. Fawsett's name is misspelled as "Fawcett" in the complaint and case caption. Plaintiffs have also separately named TJHSST as a defendant, but the school is not an entity legally separate from the School Board itself. *See* Va. Code § 22.1-71 (declaring that each public school board is "a body corporate and, in its corporate capacity, is vested with all the powers and charged with all the duties, obligations and responsibilities imposed upon school boards by law and may sue, be sued…."); *id.* § 22.1-79(5) (authorizing each school board to "operate and maintain the public schools in the school division").

[2] The Court may consider the video because it is "integral to the complaint" and "there is no dispute about the [video's] authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

bin.  *Id.* at 0:00:09–13.  John Doe covers the "victim's" head and torso with a blanket, and John Doe and Richard Roe then drag the plastic bin containing the "victim" behind a black curtain.  *Id.* at 0:00:13–17.  The student in the bin appears motionless.  *Id.*

Two new students then enter the scene, including Plaintiff Colin Coe.  *Id.* at 0:00:18–20. Colin Coe is wearing a sweatshirt that prominently depicts "a map of historic Palestine"—which closely resembles modern-day Israel—"filled with the colors of the Palestinian flag" ("Map Sweatshirt").  *Id.*; Compl. ¶ 74.  Jane Doe, flanked by John Doe and Richard Roe, asks the new students if *they* will attend the MSA meeting, and both enthusiastically answer "yes, of course." Ex. 1 at 0:00:18–23.  John Doe then nods, and he and Richard Roe leave.  *Id.* at 0:00:23–25.

The camera then goes behind the curtain to reveal the bodies of the two students who were "kidnapped."  *Id.* at 0:00:25–29.  The first student lies motionless on the ground in a fetal position, with a blanket covering his head and torso.  *Id.* at 0:00:27–29.  The second student remains motionless in the bin, with a blanket covering his entire body except for his feet, which protrude out over the bin.  *Id.* at 0:00:26–27. The video ends by cutting to the same two students smiling, with their thumbs up, beside a caption reading, "no one was harmed in the making of this video." *Id.* at 0:00:29–33; Compl. ¶¶ 65–66.

Plaintiffs allege that they did not intend this video to reference the conflict in Gaza or the October 7 attack on Israel.  Compl. ¶¶ 54–55.  They allege that they instead intended to follow a "viral comedy skit circulating nationwide," in which students are "suddenly grabbed and taken away" when they refuse to attend some student group event.  *Id*. ¶ 53.  They also allege that commercial businesses also have used "this marketing tactic" to "attract customers."  *Id.* ¶ 55.

Plaintiffs allege that other student groups "at FCPS and in TJHSST" posted "similar skits and videos intended to be outlandish and comedic."  *Id.* ¶ 59.  But they provide just two alleged

comparators. First, they allege that the Indian Student Association at Chantilly High School ("CHS") "made a skit in the school parking lot" in which students who refused to attend a meeting were "bagged and put in the trunk of a car." *Id.* ¶¶ 55, 57. Plaintiffs allege that "FCPS and Chantilly High School did not reprimand members of the Indian Student Association for the video." *Id.* ¶ 58. They do not allege that the video was reported to CHS officials or to FCPS in general. They also allege that the TJHSST Student Government Association posted a video to Instagram promoting a Mental Health and Wellness Room by "tossing a pretend grenade in the classroom and shutting the door." *Id.* ¶ 60. Plaintiffs do not allege that the video was reported to TJHSST administrators or whether and how they responded. Nor do Plaintiffs allege that either of these other videos evoked the October 7 attack in Israel or the war in Gaza, or sparked any school-based or community outrage or "hysteria."

C.      **Plaintiffs' mock-kidnapping video prompts "hysteria" that "quickly ma[kes] its way to the FCPS community."**

On Friday, October 24, 2025, an MSA member posted Plaintiffs' mock-kidnapping video to their school club's Instagram page. Compl. ¶ 80. On Sunday, October 26, 2025, a "right-wing influencer" reposted the video on X with a caption asking whether it was "[b]ad-taste or the outgrowth of a protest culture that's glorified Hamas?" *Id.* ¶¶ 82, 84. The influencer's post drew further reposts, including by other influencers. *Id.* ¶¶ 86–88. One other influencer with "thousands of followers" reposted the video and commented that it was "reenacting hostage-taking and murder—complete with keffiyehs, kidnapping, hiding of bodies." *Id.* ¶ 86. Another X user reposted the video while commenting that it made "a mockery of the kidnapping and murder of thousands of Jews," and that "[i]f you care about your Jewish friends whatsoever, send a message to FCPS and demand accountability." *Id.* ¶ 87.

Plaintiffs allege that this "hysteria continued to build momentum" and "quickly made its way to the FCPS community." *Id.* ¶¶ 90, 92. On Monday, October 27, 2025, the Jewish Community Relations Council ("JCRC") released a statement calling on TJHSST to discipline the students, stating that it had "been in close contact with the highest levels of FCPS leadership … to demand accountability." *Id.* ¶¶ 92–93. A JCRC representative later stated on a local media outlet that her principal concern was Plaintiff Colin Coe's sweatshirt, which she described as a "map of Israel" covered by the colors of Palestine. *Id.* ¶ 94. One TJHSST parent asked, in a WhatsApp group with other TJHSST parents, whether any of the chat members' students had participated in the video, and complained it was "incredibly offensive and promot[ing] violence." *Id.* ¶ 90. The parent added that they had "reported this to the school, the county and the attorney general's office." *Id.*

### D.    AP Fawsett investigates and disciplines the eight students involved, including Plaintiffs.

On Monday, October 27, 2025—the first school day after the video was posted—AP Fawsett questioned Plaintiffs privately about the video, asking "What was the intention of making this video," "Who was in the video," and "Did you want to make it look violent." Compl. ¶¶ 96–98. Plaintiffs' parents were also called. *Id.* ¶ 100. AP Fawsett told one parent that the students might be suspended, and the "disciplinary decision was hers to make." *Id.* ¶ 103.

Later that same day, Principal Mukai sent an email "to the entire TJHSST community." Compl. ¶ 107. That email—which Plaintiffs quote but do not attach to their complaint—does not identify the MSA video, or any of the students involved, by name. *See generally* Ex. 2, Mukai Email.[3] Rather, it says that the school was "aware of social media videos featuring members of

---

[3] The Court may consider this email because Plaintiffs quote and rely on it as "integral to" their stigma-plus due-process claim (*see* Compl. ¶¶ 107, 194), and "there is no dispute about the document's authenticity," *Goines*, 822 F.3d at 166–67.

high school student organizations" that "depict violence, including kidnappings." *Id.* at 1. The email refers specifically to "victims being hooded and placed in the trunk of a car," which did not occur in the TJHSST MSA video. *Id.* The email notes that videos showing "unsafe behavior, harassment, and violence" violate the FCPS code of student conduct. *Id.* It further states that "[o]ur schools must be a safe space" and encourages "collectively committing to denounce all acts of antisemitism, Islamophobia, and hatred in any form" and to "hold[ing] on to shared values of empathy, compassion, and respect for all people." *Id.* The email closes by encouraging parents "[a]s a partner in your child's education, … to be aware of your child's online actions" and "have an open conversation about making safe and smart choices online, and how those decisions can have real-world impacts," and inviting their "ideas about how we can make our schools and community a safe place for our children to learn and grow." *Id.*

On Tuesday and Wednesday, October 28 and 29, while AP Fawsett continued to conduct her investigation, Plaintiffs and four other students involved in making the video were placed in the "Alternative Instructional Area" room in the school, where they were expected to complete academic assignments. Compl. ¶¶ 108–14. On Thursday, October 30, AP Fawsett informed Plaintiffs' parents that her investigation had concluded and provided each of Plaintiffs' parents a notice imposing in-school suspension ("ISS") on each Plaintiff through November 6, 2025. Ex. 3 at 1.[4] The notice states that the MSA video, which was created "on campus," is "reasonably interpreted as menacing, hostile, and intimidating toward members of the school community." *Id.* at 1. It explains that the video depicts "students being hooded and kidnapped by being placed in a

_____

[4] Plaintiffs quote and rely on this notice throughout the Complaint, *see* Compl. ¶¶ 122–29, it is integral to their claims challenging the discipline, and its authenticity is not disputed, *see Goines*, 822 F.3d at 166–67. Defendants attach just one notice because the others are largely the same, except for names of each student and their parents.

covered container, which the administration reasonably interprets as imagery simulating forced confinement and violence, including the depiction of captives being hidden away, with one student in the fetal position." *Id*. It also reports that "[s]tudents and staff of different faiths have approached school administrators since they saw the video online to share that they now feel fearful and unsafe at school." *Id*.

Plaintiffs also allege that "[i]n addition to the suspension notice, Plaintiff Colin Coe was told he was no longer allowed to wear his Palestine sweatshirt to school." Compl. ¶ 130.

## II. Procedural history

Plaintiffs filed this lawsuit on June 4, 2026. The Complaint asserts four claims against all Defendants:

- Claim I alleges a violation of the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983, contending that Defendants treated Plaintiffs differently from other student groups that "made similar or essentially identical videos" because of their "Muslim, Arab, and Palestinian identities." Compl. ¶¶ 163, 165, 173.

- Claim II alleges a violation of the Free Speech Clause of the First Amendment under 42 U.S.C. § 1983, contending that Defendants retaliated against and restricted Plaintiffs' protected expression and that the discipline and sweatshirt restriction "cannot be justified under *Tinker*." Compl. ¶¶ 177, 181, 183.

- Claim III alleges intentional disparate-treatment discrimination on the basis of race or national origin in violation of Title VI. Compl. ¶¶ 185–86, 188.

- Claim IV alleges a violation of the Due Process Clause of the Fourteenth Amendment under 42 U.S.C. § 1983, asserting a "stigma-plus" injury and deprivation of property and liberty interests without adequate process. Compl. ¶¶ 191, 194, 198–99.

Plaintiffs seek declaratory and injunctive relief (including expungement of the disciplinary records) and an injunction prohibiting any ban on Colin Coe's sweatshirt, compensatory and punitive or nominal damages, and costs and fees. Compl., Prayer for Relief. On July 23, 2026,

the parties filed a Joint Stipulation that Defendants will not discipline any Plaintiff for merely wearing the Map Sweatshirt or similar clothing.  ECF 18 ¶ 2.

### ARGUMENT

To survive dismissal under Rule 12(b)(6), Plaintiffs' complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  That is, the complaint's factual allegations must allow a "court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Courts accept well-pleaded factual allegations as true, but not "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action." *Id.*  Plaintiffs cannot rely on "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

Plaintiffs fail to state a claim against any Defendant.  Sections I–IV explain why each claim fails, in its entirety, on the merits.  Plaintiffs' Equal-Protection and Title VI claims do not plausibly allege discriminatory intent; their First Amendment claim fails under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969); and Plaintiffs' due process claim fails on multiple grounds.  Section V explains why each claim separately fails against particular Defendants and why Plaintiffs cannot recover some of the relief they seek as a matter of law.

### I.   Plaintiffs fail to state an Equal Protection claim.

The Equal Protection Clause prohibits "governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see Katti v. Arden*, 161 F.4th 217, 226 (4th Cir. 2025).  To state a claim, Plaintiffs must plausibly allege that (1) they have "been treated differently from others with whom [they are] similarly situated"; and (2) "the unequal treatment was the result of intentional or purposeful

discrimination" based on race, religion, or national origin. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).[5]  Here, Plaintiffs' allegations satisfy neither requirement.

### A.      Plaintiffs were not treated differently from any similarly situated students.

To allege disparate treatment, Plaintiffs must allege that comparators were treated differently despite being "similarly situated in all relevant respects." *Katti*, 161 F.4th at 226.  To be "sufficiently similar," comparators "must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the school's treatment of them for it." *Doe v. Fairfax Cnty. Sch. Bd.*, 403 F. Supp. 3d 508, 516 (E.D. Va. 2019) (citation omitted, emphasis removed).

Here, Plaintiffs purport to identify two comparators: students in the Indian Student Association at CHS who posted a video in which students who declined to attend a meeting were "bagged and put in the trunk of a car," Compl. ¶¶ 57–58, and students in the TJHSST Student Government Association ("SGA") who posted a "skit" in which the students "toss[ed] a pretend grenade" in a classroom, *id*. ¶ 60.

At the outset, Plaintiffs do not allege the religions, races, or national origins of any of these students. *See id.* ¶¶ 57–60.  While they allege that the CHS students were in the Indian Student Association, they do not allege that membership in that organization is limited to students of Indian origin. *Id.* ¶¶ 57–58.  And Plaintiffs provide no indication of the religion, race, or national origin of anyone in the SGA video. *Id.* ¶ 60.  In the absence of any allegations that these students' religions, races, and/or national origins differed from Plaintiffs, Plaintiffs have not alleged any differential treatment based on a protected characteristic.

---

[5] Plaintiffs here allege they were treated "differently because they are Muslim, Arab, and Palestinian." Compl. ¶ 6.  Plaintiffs must also "plausibly allege that, under the appropriate level of constitutional scrutiny, the difference in treatment is unjustified." *Katti*, 161 F.4th at 226.

Plaintiffs' claim fails for this reason alone.  But even if the Court were to assume the other students' religions, races, and/or national origins, Plaintiffs also fail to allege that either set of students is otherwise "similarly situated" to Plaintiffs in "all relevant respects."  *Katti*, 161 F.4th at 226; *see also Aljizzani v. Middle E. Broad. Networks, Inc.,* 178 F.4th 863, 869 (4th Cir. 2026) (rejecting "generalized comparisons based simply on allegations that other individuals posted on social media without reprimand") (citation omitted).

### 1.     The CHS students are not similarly situated to Plaintiffs.

As a threshold matter, the CHS students are not similarly situated to Plaintiffs because they attend a different school and are not under the authority of the individual who disciplined Plaintiffs. Plaintiffs' discipline was issued by their high school administrator, AP Fawsett.  Compl. ¶ 103; Ex. 3.  Plaintiffs do not and cannot allege that AP Fawsett had disciplinary authority over the CHS students.  Indeed, Plaintiffs do not even allege that the CHS students' video was reported to *their* school administration.  That the CHS students were under the authority of "a different individual than the decisionmaker in Plaintiff[s'] case" is "a fatal distinction."  *Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355, 368 n.16 (E.D. Va. 2004).[6]

Even if Plaintiffs could overcome that fatal defect, the CHS students are also not similarly situated to Plaintiffs for at least three additional reasons.

First, Plaintiffs do not allege that the CHS students filmed their video during school hours and in the school building, as Plaintiffs did.  Second, they do not allege that the CHS students' video evoked the same imagery that Plaintiffs' video did, which featured significantly in the stated

---

[6] *See also McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 427 F. Supp. 2d 595, 610 (E.D.N.C. 2006) ("To be similarly situated the employees must have been disciplined by the same supervisor.") (citation omitted); *Katti*, 161 F.4th at 226–27 ("Without an allegation that *these* defendants were involved [with the treatment of comparators], there is no way the district court could have reasonably inferred that [the defendants] treated [the plaintiff] and a similarly situated comparator differently.").

reasons for the school-based discipline imposed on Plaintiffs.  Plaintiffs' video depicted a mock kidnapping performed by students using keffiyehs to hood their victims, and wearing clothing with the Crescent Moon and Star, and a map of "historic Palestine" (essentially, modern-day Israel) overlaid by the colors of the Palestinian flag.  Compl. ¶¶ 63–66, 74, 77–79.  The video showed the "kidnapped" students' bodies lying motionless in a container, suggesting that they had been killed. Plaintiffs do not allege that the CHS students' video contained any similar props, symbols, or imagery that could be construed as alluding to the October 7 attack on Israel (a recent mass casualty event that occurred in October 2023) or the ongoing geopolitical conflict and war in Gaza.  And Plaintiffs' discipline turned on precisely those features, as the suspension notice explained the video contained "imagery and symbols reasonably interpreted as menacing, hostile, and intimidating" and which "created an environment hostile to the rights of Jewish students and staff." Compl. ¶¶ 122–24; *see also* Ex. 3 at 1.  A comparator without those features is not "similarly situated in all relevant respects."  *Katti*, 161 F.4th at 226.

Third, the CHS students' video did not cause the reaction that Plaintiffs' video did. Plaintiffs allege that their video generated widespread "hysteria," national media attention, and demands for discipline.  Compl. ¶¶ 82, 86–88, 92–94.  They allege no similar outcry generated by the CHS students' video.  This is yet another "differentiating … circumstance[]" that defeats Plaintiffs' claim.  *Allen v. Dorchester Cnty.*, No. ELH-11-01936, 2013 WL 5442415, at *11 (D. Md. Sept. 30, 2013).

### 2. The SGA Students Are Not Similarly Situated to Plaintiffs.

The SGA students are also not similarly situated to Plaintiffs.  Plaintiffs do not allege that those students' "skit" was similar in any respect to their video.  They do not allege that the video feigned a "kidnapping" or involved anything that was construed (or even could have been construed) as a reference to the October 7 attack or war in Gaza.  They do not allege that the video

-12-

generated any reaction, much less a community-wide reaction and complaints to school officials. Indeed, they do not even allege when that skit was posted or whether TJHSST administrators ever received any complaints or reports from anyone that it was disturbing or distressing. The SGA students are not plausibly "similarly situated in all respects" to Plaintiffs.

**B.      Plaintiffs fail to plead that any discipline was the product of discriminatory intent.**

Even if Plaintiffs had alleged similarly situated comparators (and they did not), they failed to adequately allege that their treatment was the result of intentional discrimination. This intent requires more than just "awareness of consequences"; the decisionmaker must have acted "at least in part 'because of,' not merely 'in spite of,'" Plaintiffs' religion, race, or national origin. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In other words, Plaintiffs must plausibly allege that an "invidious discriminatory purpose" was "a motivating factor" in the decision to discipline them. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Plaintiffs fail to plausibly allege such intent here.

**1.      Plaintiffs fail to adequately allege discriminatory intent under the *Arlington Heights* factors.**

The Fourth Circuit has identified "several factors" as "probative" of whether a defendant "was motivated by a discriminatory intent":

(1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons;

(2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents;

(3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and

(4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995) (quoting *Arlington*, 429 U.S. at 265).  None supports an inference of intent here.

First, Plaintiffs do not allege a "consistent pattern" of actions that disparately impact students who are Muslim, Arab, or Palestinian.  *Sylvia*, 48 F.3d at 819.  Nor do they allege any "historical background" suggesting discriminatory intent.  *Id*.  They instead complain of a single disciplinary decision.

Second, the alleged "specific sequence of events" does not support an inference of discriminatory intent either.  *Id*.  By their own account, Plaintiffs were disciplined only after their video prompted outrage within the FCPS community soon after it was posted on social media and TJHSST administration completed a three-day investigation.  *See, e.g.,* Compl. ¶¶ 82–94, 96–98, 108–22.  Plaintiffs' suspension notices confirm that "[s]tudents and staff of different faiths" had "approached school administrators since they saw the video online to share that they now feel fearful and unsafe at school."  Ex. 3 at 1.  By Plaintiffs' own allegations, they were disciplined because of the school community's reaction to the video, not because of who they are.

Third, the "contemporaneous statements" Plaintiffs cite do not give rise to a plausible inference of discriminatory intent.  Plaintiffs allege that Principal Mukai's email described the video as an act of "antisemitism."  Compl. ¶ 107.  But that characterization is disproved by the email itself which merely expresses a desire "to denounce all acts of antisemitism, Islamophobia, and hatred in any form."  Ex. 2 at 2.  Moreover, Principal Mukai imposed none of the challenged discipline—AP Fawsett did.  Compl. ¶¶ 103, 131; *see also infra* Section V.B.

> **2.   Plaintiffs fail to adequately allege that Defendants adopted the discriminatory intent of others.**

Unable to allege any facts to show discriminatory intent by any Defendant, Plaintiffs appear to propose that discriminatory intent is a transitive property—if the community's reaction

to Plaintiffs' video was discriminatory, and if the Plaintiffs received in-school discipline because of that reaction, then Defendants themselves acted with discriminatory intent. *See, e.g.,* Compl. ¶¶ 3, 85, 88–89, 168. But that is not the law.

State officials *can* be responsible for the discriminatory intent of the public—but "only where" (a) the public is "overwhelmingly opposed" to the plaintiffs "for a distinct discriminatory reason," and (b) officials "were clearly swayed by that public opposition, fully aware of its basis in discrimination and prejudice." *Sylvia*, 48 F.3d at 824. Plaintiffs do not plausibly allege either.

First, Plaintiffs fail to allege facts to show that the community's reaction was "overwhelmingly" driven by a "distinct discriminatory reason." *Sylvia*, 48 F.3d at 824. As the Complaint itself recounts, the community's reaction was driven by the video's depiction of kidnapping paired with clothing and symbols connected to the October 7 attack on Israel and the ongoing war in Gaza. Compl. ¶¶ 82, 84, 92–94, 122–24. Nothing Plaintiffs allege plausibly suggests that this same video—performed with this same imagery and symbols—would have drawn an "overwhelmingly" different reaction if the students who filmed it were Latino or Christian. *Sylvia*, 48 F.3d at 824. To be sure, Plaintiffs allege that the reactions by some members suggested discriminatory animus. *See, e.g.,* Compl. ¶ 88 (recounting two "hateful Islamophobic and anti-Arab comments" on the X social media platform). But nothing in the complaint plausibly suggests that it was "overwhelmingly" so. *Sylvia*, 48 F.3d at 824.

Second, even if Plaintiffs had plausibly alleged that the community's reaction was "overwhelmingly" based on discriminatory animus, Plaintiffs have not plausibly alleged that AP Fawsett was "fully aware" that this reaction had a "basis in discrimination and prejudice" against Plaintiffs based on their race, religion, or national origin. *Id.* Plaintiffs plausibly allege that AP Fawsett was aware of the community reaction, and that she was prompted into action by that

-15-

reaction.  *See* Compl. ¶¶ 124–25.  But Plaintiffs fail to plausibly allege that she *knew* that the community's reaction had an "overwhelming[]" "basis in discrimination and prejudice." *Sylvia*, 48 F.3d at 824.

Plaintiffs also allege that the suspension notice described Plaintiff Colin Coe's Map Sweatshirt as depicting an "eliminationist message," Compl. ¶ 124, claiming this shows that Defendants "credited and relied upon the discriminatory statements" of the JCRC and others, and these groups and community members "were themselves motivated by animus against Plaintiffs' religion, race, and national origin." *Id.* ¶ 168.  The use of the term "eliminationist" to describe Plaintiff Colin Coe's Map Sweatshirt reflects an interpretation of the sweatshirt's content—by overlaying a map of "historic Palestine" (essentially, modern-day Israel) with the colors of the Palestinian flag, the symbol was seen by some as calling for elimination of the state of Israel.  That interpretation may be contested, but it does not plausibly suggest that AP Fawsett acted *because of* Plaintiffs' race, religion, or national origin.

Plaintiffs may argue that Defendants should have better explained the video to the offended community members.  But that does not push their Equal Protection claim over the line of plausibility.  The Court's role in a civil rights challenge to student discipline is not as a "super-administrator" to second-guess the judgments made by educators entrusted with responsibility to ensure a safe and inclusive learning environment for all students.  Indeed, "[j]udicial interposition in the operation of the public school system" requires "care and restraint."  *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 878 (4th Cir. 2023) (citation omitted).  That is because "no single tradition in public education is more deeply rooted than local control over the operation of schools."  *Id.* (citation omitted).  Instead, the Court's role is to assess whether Plaintiffs have plausibly alleged that Defendants intentionally *discriminated* against Plaintiffs on the basis of their

race, religion or national origin by disciplining Plaintiffs for a video filmed in school, posted under a school club's name, mocking violent crime that distressed many in the school community. *Morrison*, 239 F.3d at 654.  Even accepting all the alleged facts as true, the answer is no.

## II.    Plaintiffs fail to state a Title VI claim.

Plaintiffs' Title VI claim fails for the same reason as their Equal Protection claim—they have not plausibly alleged intentional discrimination.  Like the Equal Protection clause, Title VI "prohibits only intentional discrimination, not 'disparate impact' practices."  *Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)).  Indeed, Title VI "proscribes only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment."  *Id.* (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)).  As explained above, Plaintiffs allege that they were disciplined "because of" the community's reaction to their video, not because of their race, color, or national origin.  *See supra* Section I.B.

## III.    Plaintiffs fail to state a First Amendment claim.

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker*, 393 U.S. at 506.  But schools do have "special leeway" when regulating "speech that occurs under its supervision."  *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 188 (2021).  That is because, among other reasons, schools "at times stand *in loco parentis*, i.e., in the place of parents."  *Id.* at 187.

This "special leeway" allows schools to discipline students for speech that would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school" or "collid[e] with the rights of others."  *Tinker*, 393 U.S. at 513.  And in exercising this power, schools may "act to prevent problems before they occur"—they are "not limited to prohibiting and punishing conduct only after it has caused a disturbance."  *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 259 n.7 (4th Cir. 2003).  Accordingly,

-17-

schools can regulate speech when they "reasonably *forecast* a substantial disruption." *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 439–40 (4th Cir. 2013) (emphasis added). And courts "will not second guess their reasonable decisions." *Id.* at 440. "[I]t is axiomatic that federal courts should not lightly interfere with the day-to-day operation of schools." *Id*. (citation omitted).

Accepting Plaintiffs' allegations as true, AP Fawsett could reasonably forecast that Plaintiffs' kidnapping video would substantially disrupt the school and collide with the rights of other students. The video was filmed on school grounds during the school day, Compl. ¶ 62, and, as the suspension notice explained, was "reasonably interpreted as menacing, hostile, and intimidating toward members of the school community," Ex. 3 at 1.

By Plaintiffs' own account, the video did not remain a matter of quiet, peaceable expression—it triggered precisely the kind of turmoil *Tinker* allows schools to redress and even forestall. Within days of being posted, the video went viral and prompted "hysteria" that "continued to build momentum." Compl. ¶¶ 82, 90–91. It was reposted by multiple online "influencers," reaching "thousands of followers," with many calling for accountability from school officials. *Id.* ¶¶ 86–88, 90, 92–93. The JCRC released a public statement noting that it had "been in close contact with the highest levels of FCPS leadership … to demand accountability." *Id*. ¶¶ 92–93. A JCRC representative then appeared on a local media outlet to object specifically to Plaintiff Colin Coe's Map Sweatshirt. *Id*. ¶ 94.

As Plaintiffs themselves admit, the "hysteria … quickly made its way to the FCPS community." *Id*. ¶¶ 90, 92.[7] At least one TJHSST parent allegedly reported the video "to the

---

[7] Plaintiffs also cite and link to a Washington Post article, Compl. ¶ 147 n.7, reporting that the "[f]allout from the video … reverberated within the school." https://www.washingtonpost.com/education/2025/11/06/muslim-student-association-video-virginia/.

school, the county and the attorney general's office," describing it as "incredibly offensive and promot[ing] violence." *Id*. ¶ 90. And the suspension notice recounts that "[s]tudents and staff of different faiths have approached school administrators since they saw the video online to share that they now feel fearful and unsafe at school." Ex. 3 at 1. These allegations establish, at a minimum, a "well-founded expectation of disruption," *Newsom*, 354 F.3d at 259, that is more than sufficient under *Tinker*.

It does not matter whether Plaintiffs intended to cause this disruption. *See* Compl. ¶¶ 71–72. Even if Plaintiffs only wanted to display "symbol[s] of [their] heritage and religious faith," that "intent … is irrelevant." *Hardwick*, 711 F.3d at 439. Here, the disruption was a foreseeable consequence of filming and posting a mock-kidnapping video on school grounds featuring symbols associated with the October 7 attack. The fact that the disruption was amplified by outside actors does not insulate Plaintiffs from the foreseeable consequences of their own expressive choices. "[T]he proper focus" is simply "whether school officials could predict that the [expression] would cause a disruption." *Id*. They could here, and this court should not "second guess" that decision. *Id*. Accordingly, Plaintiffs' discipline was justified under *Tinker*.

This analysis is no different for the alleged ban of Colin Coe's Map Sweatshirt. That sweatshirt was one of the "principal" reasons that the video generated community outrage, as reflected in the JCRC's local media interview. *See* Compl. ¶ 94. Accordingly, this discipline was justified under *Tinker* too.

## IV.    Plaintiffs fail to state a procedural due process claim.

Plaintiffs appear to allege two types of procedural due process claims: one based on a property interest in their public education, Compl. ¶¶ 197–201; and the other based on a liberty interest in their reputations, *id*. ¶¶ 191–96. They fail to state a claim under either theory.

-19-

### A.    Plaintiffs received due process for their short-term in-school suspensions.

Plaintiffs first allege that Defendants deprived them of an alleged property interest in their public education by suspending them "without a meaningful opportunity to be heard or to view evidence against them." Compl. ¶¶ 197–201. This claim fails for two independent reasons.

First, Plaintiffs cannot establish a deprivation of any property interest. They do have a general property interest in public education. *See Goss v. Lopez*, 419 U.S. 565, 574 (1975). But "courts have consistently held that a plaintiff's in-school suspension would not implicate the requirements of due process." *Mason v. Bd. of Educ.*, No. WMN-10-3143, 2011 WL 89998, at *4 (D. Md. Jan. 11, 2011) (citing *Laney v. Farley*, 501 F.3d 577, 582 (6th Cir. 2007)); *see also Laney*, 501 F.3d at 582 (collecting cases); *Wise v. Pea Ridge Sch. Dist.*, 855 F.2d 560, 563 n.3 (8th Cir. 1988) (refusing to apply "the strictures of procedural due process in the context of a temporary in-school suspension"). To support a Due Process claim, the in-school suspension must approach a "total exclusion from the educational process." *Goss*, 419 U.S. at 576; *see also Graham v. Animas Sch. Dist.*, No. CV 07-1057 BB/WPL, 2008 WL 11412139, at *2 (D.N.M. Jan. 30, 2008) (holding that a five-day in-school suspension "is de minimis," and that "the vast majority of legal authorities have found no due process rights for such short term in-school suspension").

Here, Plaintiffs' short-term in-school suspensions fall well short of a "total exclusion from the educational process." *Goss*, 419 U.S. at 576. Plaintiffs allege that during their suspensions they were unable to meet with their teachers and denied other unspecified "educational resources." Compl. ¶ 110. But they were still given "academic assignments." *Id.*; *see also* Ex. 3 at 2 ("A staff member is assigned to the ISS room to ensure that students receive and complete the assignments without interference in their academic progress."). Accordingly, while Plaintiffs may allege "significant educational disruption," Compl. ¶ 159, they don't allege anything approaching "total exclusion from the educational process," *Goss*, 419 U.S. at 576.

Second, even assuming deprivation of a protected property interest, Plaintiffs received all the process they were due.  Even for *out*-of-school suspensions of ten days or fewer, Due Process requires only that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581.[8]  By their own allegations, Plaintiffs received that.  They received "oral … notice," *id.*, that they were being investigated for the mock-kidnapping video, Compl. ¶¶ 96–98, 100.  They were informed of the "evidence the authorities have" against them, *Goss*, 419 U.S. at 581—*i.e.*, the video itself, *see* Compl. ¶¶ 96–98, 100.  And they had the opportunity to "present [their] side of the story," *Goss*, 419 U.S. at 581—they explained that the video was part of a nationwide viral trend, and presented videos posted by other student groups. Compl. ¶¶ 71, 105.  Because the process that Plaintiffs actually received would have sufficed even for a ten-day *out*-of-school suspension, it was necessarily sufficient for their week-long *in*-school suspensions.  Plaintiffs' due process claim fails as a matter of law.

This conclusion is not affected by Plaintiffs' complaints about their disciplinary process.

First, Plaintiffs allege they "had no opportunity to cross-examine" third parties "such as JCRC."  *See* Compl. ¶ 199.  But as *Goss* made clear, students are *not* entitled to "trial-type procedures" such as the right to "confront and cross-examine witnesses," which "might well overwhelm" the school.  419 U.S. at 583; *see also Doe*, 403 F. Supp. 3d at 520 (applying this rule in the context of school discipline).

Second, Plaintiffs suggest that AP Fawsett impermissibly prejudged their guilt.  Compl. ¶¶ 98, 103.  But school officials, like other state decisionmakers, "are entitled to a presumption of

---

[8] *See also Wofford v. Evans*, 390 F.3d 318, 322 n.1 (4th Cir. 2004) ("[A] school official must only notify the pupil of the charge, explain the evidence supporting it, and offer the student an opportunity to respond.").

honesty and integrity." *Morris v. City of Danville*, 744 F.2d 1041, 1044 (4th Cir. 1984). Overcoming that presumption requires "a strong showing of bad faith or improper behavior." *Doe*, 403 F. Supp. 3d at 521. Plaintiffs' attempts fall far short.

They allege that AP Fawsett "questioned the students aggressively, as if she had concluded that Plaintiffs had done something wrong." Compl. ¶ 98. But the questions they quote are basic factual queries like "What was the intention of making this video," "Who was in this video," "Did you want to make it look violent"; and who "came up with this whole thing." *Id.* Nothing in those questions suggests bad faith, much less "a strong showing" of it. *Doe*, 403 F. Supp. 3d at 521.

Plaintiffs also allege that early in the investigation, AP Fawsett told a parent that "she was just looking for the proper code violation." Compl. ¶ 103. But they also allege that after making this statement, AP Fawsett said she would "look into these other videos and groups," *id*. ¶ 104, and then conducted three days of investigation, *id.* ¶¶ 120–21. This single statement is far from a "strong showing of bad faith or improper behavior." *Doe*, 403 F. Supp. 3d at 521. Indeed, a "conditional decision," made during an investigation that "had not then closed," cannot overcome the presumption of impartiality. *Morris*, 744 F.2d at 1044; *see also id.* (rejecting argument that an official "ceased to be an impartial decisionmaker simply by virtue of having made a conditional decision to terminate [the plaintiff] pending further developments"); *Doe*, 403 F. Supp. 3d at 521 (rejecting argument that a school official "prejudged [plaintiff's] guilt" by telling plaintiff's alleged victim that the official "'believed' her when she initially reported the harassment"). And in any event, even if AP Fawsett had made up her mind at the time of that statement, that conclusion would not have been unfair—by that point, she had already seen the video and witnessed its effect.

<u>Third</u>, Plaintiffs allege that AP Fawsett did not ask Plaintiff Colin Coe about his "intentions" in wearing the Map Sweatshirt. Compl. ¶ 126. But Plaintiffs' discipline turned on

how the video was "reasonably interpreted," Ex. 3 at 1—not Plaintiffs' subjective intent. *See also Hardwick*, 711 F.3d at 439–40 (a student's "intent" that expression "be only a symbol of her heritage and religious faith is irrelevant").

Finally, Plaintiffs suggest that *Principal Mukai* prejudged their guilt by publicly characterizing the video in a letter as "antisemitism" before the investigation concluded. Compl. ¶ 107. Not only is that allegation belied by Principal Mukai's email (*see* Exhibit 2), but it is also irrelevant. Principal Mukai did not impose the in-school suspensions—AP Fawsett did. *See supra* Statement of the Case § I.D.

Plaintiffs' first Due Process claim must be dismissed.

### B. Plaintiffs fail to state a stigma-plus claim.

Plaintiffs separately allege a "stigma-plus" claim—*i.e.*, that Defendants deprived them of their "liberty interest in their reputation" by labeling their actions as "antisemitic" in connection with their suspensions. Compl. ¶¶ 193–94. This second claim also fails.

A stigma-plus claim requires both a "stigma" and a "plus." The "stigma" is a public statement that implies "the existence of serious character defects such as dishonesty or immorality." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308–09 (4th Cir. 2006). But an effect on "reputation alone" is not enough. *Paul v. Davis*, 424 U.S. 693, 701, 706 (1976). Plaintiffs must also allege a "plus": that the stigma was coupled with state action that "distinctly altered or extinguished" a legal right or status. *Id.*

As with other Due Process claims, the injury is procedural—i.e., that the plaintiff was deprived of a liberty interest without a "name-clearing hearing." *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002). The remedy is also procedural—a "name clearing hearing" to dispute the stigma allegedly imposed. *Davenport v. Casteen*, 878 F. Supp. 871, 879 (W.D. Va. 1995).

Here, Plaintiffs fail to state a stigma-plus claim for two independent reasons.

-23-

First, Plaintiffs fail to allege that they "requested a name-clearing hearing" and that "the request was denied." *Carroll v. Town of Univ. Park*, 12 F. Supp. 2d 475, 482 (D. Md. 1997), *aff'd*, 155 F.3d 558 (4th Cir. 1998) (citation omitted).  Courts in this Circuit have consistently dismissed stigma-plus claims for failure to request this hearing prior to filing suit.[9]  That alone is fatal.

Second, Plaintiffs fail to allege all elements of a stigma-plus claim against any one defendant.  That too is fatal, because each defendant is liable only for their "own individual actions." *Iqbal*, 556 U.S. at 676.  "Allegations against a common employer cannot substitute" for each defendant's "personal involvement," "[n]or can alleged conduct by one individual defendant be attributed to another."  *Katti*, 161 F.4th at 224; *see also id.* ("Try as he might, [the plaintiff] cannot pin the institutional actions of NCSU on the individual defendants in this case.").

Here, Plaintiffs have not alleged that any individual defendant is responsible for both the "stigma" and the "plus."  Plaintiffs allege that Principal Mukai was responsible for the "stigma" (the email allegedly labeling Plaintiffs' video as "antisemitic").  Compl. ¶ 107.  But they do not allege his involvement in the "plus" (the in-school suspension).  *Id.*  Conversely, Plaintiffs allege that two other defendants were responsible for the "plus" but not the "stigma."  AP Fawsett stated that "the disciplinary decision was hers to make," Compl. ¶ 103, and the suspension notices confirm that she "made the decision to assign ISS," Ex. 3 at 3.  Plaintiffs also assert (in conclusory

---

[9] *See Lynch v. Beaufort Cnty.*, No. 9:24-CV-03193-DCN-KFM, 2025 WL 4483957, at *7 (D.S.C. May 8, 2025) ("[N]owhere does [the plaintiff] plead that she actually requested a name-clearing hearing."); *Rogosin v. Mayor, City Council of Baltimore*, 197 F. Supp. 2d 345, 354 (D. Md. 2002) ("Plaintiffs have failed to come forward with evidence … [that they] ever requested a name-clearing hearing."); *Davenport*, 878 F. Supp. at 879 ("Under most circumstances, a plaintiff's failure to request a name clearing hearing should prevent him from complaining that one was not afforded."); *see also Awrey v. Gilbertson*, 833 F. Supp. 2d 738, 742–43 (E.D. Mich. 2011) ("Plaintiff has never asked the University or its officials for a name clearing hearing").

fashion) that Superintendent Reid was responsible for the discipline.  Compl. ¶ 13.  But they do not allege that either defendant had any involvement with the "stigma."  *See id.*[10]

Some courts allow plaintiffs to attribute the "stigma" and the "plus" to "different origins"—but only for purposes of showing "[t]he existence of a *liberty interest*."  *See Velez v. Levy*, 401 F.3d 75, 89 n.12 (2d Cir. 2005) (emphasis in original).  That "is a very different question" than "whether both the originator of the stigma and the imposer of the plus" are actually "*liable* to the plaintiff."  *Id.* (emphasis added).  Where, as here, the plaintiff does not allege that any individual defendant is responsible for both components, the plaintiff may have alleged a liberty interest, but hasn't alleged that anyone is actually liable for violating it, which dooms the claim.

## V.    Plaintiffs' claims must be dismissed against multiple Defendants and certain forms of relief on technical grounds.

Plaintiffs' claims should be dismissed in their entirety for the reasons explained above.  *See supra* Sections I–IV.  Their claims also fail against particular Defendants and for certain relief.

### A.    Black-letter law requires dismissal of claims against certain parties.

For many of Plaintiffs' claims, black letter law establishes that Plaintiffs simply sued the wrong parties.  This is true for two categories of defendants.

First, the official-capacity claims against Superintendent Reid, Principal Mukai, and AP Fawsett must be dismissed.  Official-capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citation omitted).  These are "essentially a claim against the [School] Board and thus should be dismissed as duplicative."  *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004).

---

[10] Further, as explained above, Principal Mukai's email did not state that Plaintiffs' video, or any other, was "antisemitic"—only that the school was committed to "denounc[ing] all acts of antisemitism, Islamophobia, and hatred in any form."  Ex. 2 at 2.

Second, the Title VI claim must be dismissed against every individual Defendant.  "To prevail on a claim under Title VI, a plaintiff must prove that the defendant received federal financial assistance…."  *Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 844 (D.S.C. 2015); *see also* 42 U.S.C. § 2000d (prohibiting "discrimination under any program or activity receiving Federal financial assistance").  Accordingly, "[t]he proper defendant in a Title VI case is an entity rather than an individual."  *Callum*, 137 F. Supp. 3d at 844.  Plaintiffs allege that the School Board is the only recipient of federal financial assistance.  Compl. ¶ 11.  Accordingly, the Title VI claim cannot proceed against any other defendant.[11]

### B. All claims against Superintendent Reid and Principal Mukai must be dismissed for lack of personal involvement.

When suing officials in their individual capacities, "a plaintiff must plead that each Government-official defendant" violated the Constitution "through the official's own individual actions."  *Iqbal*, 556 U.S. at 676; *see also Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (dismissing claim where "[n]o allegation has been made … that [the defendant] had any personal connection" to the alleged constitutional violation).  Here, Plaintiffs fail to allege such involvement by either Principal Mukai or Superintendent Reid.

**Principal Mukai**.  Plaintiffs do not allege that Principal Mukai had any personal involvement in Plaintiffs' discipline.  Plaintiffs allege that it was AP Fawsett—not Principal Mukai—who questioned Plaintiffs, conducted the investigation, made the disciplinary decision, and issued the in-school suspension notice.  Compl. ¶¶ 97–98, 103, 120–21; *see also* Ex. 3; Compl. ¶ 131.  The only conduct Plaintiffs attribute to Principal Mukai is the October 27 email, Compl. ¶ 107—which did not impose any discipline, *see* Ex. 2.

---

[11] TJHSST is also not a proper defendant for the reasons explained above.  *See supra* n. 1.

**Superintendent Reid**.  Plaintiffs offer only a conclusory assertion that Superintendent Reid "reviewed and approved the disciplinary actions and speech restrictions imposed on Plaintiffs."  Compl. ¶ 13.  They identify no action she took, no decision she made, and no facts showing that she knew of and disregarded any risk of constitutional injury.

This is precisely the sort of "[t]hreadbare recital" that courts deem insufficient.  *Iqbal*, 556 U.S. at 678.  *Iqbal* rejected "bare assertions" that the defendants 'knew of, condoned, and willfully and maliciously agreed to subject him' to harsh conditions of confinement," holding they "are conclusory and not entitled to be assumed true."  *Id.*  The Fourth Circuit similarly rejected the "boilerplate conclusion" that defendants "either maintained actual or constructive knowledge of the risk" underlying a deliberate-indifference claim.  *King v. Riley,* 76 F.4th 259, 269 (4th Cir. 2023).  Plaintiffs' assertion that Superintendent Reid "reviewed and approved" the challenged discipline is equally deficient.  *See, e.g., Reading v. N. Hanover Twp.*, No. 1:23-CV-1469 (KMW-SAK), 2026 WL 102849, at *23 (D.N.J. Jan. 13, 2026), *appeal docketed*, No. 26-1963, (3d Cir. Apr. 28, 2026) (rejecting "[c]onclusory assertions" that a defendant "'ratified,' 'approved,' or 'acquiesced in' the [challenged] conduct").

C.    **Plaintiffs' claims for money damages against AP Fawsett are barred by qualified immunity.**

Even if Plaintiffs had stated a constitutional claim under § 1983 (and they have not, *see supra* Sections I, II–IV), their claims for money damages against AP Fawsett would independently fail.  As explained above, each individual defendant is responsible only for his or her actions, and the only individual alleged to have imposed the challenged discipline is AP Fawsett.  *See supra* Section V.B; Compl. ¶¶ 103, 120–21.  AP Fawsett is entitled to qualified immunity.

Qualified immunity "shields … officials from money damages" unless they violated a right that was "clearly established" at the time of the challenged conduct.  *Ashcroft v. al-Kidd*, 563 U.S.

-27-

731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  This doctrine gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* at 743.  And this ensures that the "fear of being sued" will not "dampen the ardor" of officials "in the unflinching discharge of their duties." *Harlow*, 457 U.S. at 814 (citation omitted).  For that reason, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (citation omitted).

Consistent with this high standard, a right is "clearly established" only when "every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (citation omitted).  The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality"—"[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* at 12 (citation omitted).  Existing precedent need not be "directly on point," but it "must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

These principles apply with full force on a motion to dismiss.  Qualified immunity is "an immunity from suit rather than a mere defense to liability," so it is "effectively lost if a case is erroneously permitted to go to trial," and courts should resolve immunity "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (citation omitted).

Here, Plaintiffs have not alleged that AP Fawsett violated "clearly established law" with regard to any constitutional claim.  Disciplining students because of the impact of their video is not discrimination "because of" race, religion, or national origin. *See supra* Section I.  But even if it were, no case places that "beyond debate." *al-Kidd*, 563 U.S. at 741.

So too for Plaintiffs' First Amendment claim.  "First Amendment parameters may be especially difficult to discern in the school context," so "educators are rarely denied immunity

from liability arising out of First-Amendment disputes." *Abbott v. Pastides*, 900 F.3d 160, 174 (4th Cir. 2018) (citation omitted). Here, AP Fawsett did not violate the First Amendment at all. *See supra* Section III. But at a minimum, this is not the "rare[]" case where a violation was "beyond debate." *Abbott*, 900 F.3d at 174; *al-Kidd*, 563 U.S. at 741.

Finally, the same is true for Plaintiffs' Due Process claim. Even if a Due Process violation had occurred (and it did not, *see* Section IV), that violation was not "clearly established" given, among other things, the tenuous nature of Plaintiffs' claimed property interest, the process Plaintiffs did receive, and that Plaintiffs never even requested a "name-clearing" hearing. *Id.*

### D.    All three constitutional claims against the School Board must be dismissed under *Monell*.

Plaintiffs' constitutional claims against the School Board fail to satisfy the standards for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978). Under *Monell*, a local governing body "cannot be held liable under § 1983 on a *respondeat superior* theory." *Id*. Rather, the public body may be liable only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. Failure to allege a policy or custom requires dismissal. *Walker v. Prince George's Cnty.*, 575 F.3d 426, 431 (4th Cir. 2009).

A municipal policy or custom can arise in four ways: (1) "an express policy"; (2) a decision "of a person with final policymaking authority"; (3) "an omission, such as a failure to properly train," that reflects deliberate indifference; or (4) a practice "so persistent and widespread as to constitute a custom or usage with the force of law." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)).

-29-

The Complaint does not attempt to fit the claims against the School Board under any of these theories. Plaintiffs do not allege AP Fawsett was implementing or executing an "official policy" or "custom" when she disciplined them for the video. Just the opposite, they allege that other FCPS student groups were *not* disciplined for partaking in the same social media trend. *See* Compl. ¶¶ 57–61.

Further, Plaintiffs also do not and cannot allege that the associate principal of one high school has final policymaking authority for the School Board which supervises all of FCPS. "There is a marked difference between the authority to make final policy and the authority to make final implementing decisions." *Misjuns v. City of Lynchburg*, 139 F.4th 378, 385 (4th Cir. 2025). "[P]olicymaking authority implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987) (cleaned up). Plaintiffs conclusorily allege that Superintendent Reid "reviewed and approved the disciplinary actions and speech restrictions imposed on Plaintiffs" (Compl. ¶ 13), but that bare allegation is unadorned by any facts showing her personal involvement. And Plaintiffs certainly do not allege any involvement by the members of the School Board—the body charged by Virginia law with the duty to adopt the code of student conduct for the school division. Va. Code § 22.1-279.6(B).

Plaintiffs do not plausibly allege that their alleged constitutional injuries were the result of an official custom or policy of the School Board, so their municipal liability claims fail.

**CONCLUSION**

For all of these reasons, Defendants respectfully request that this Court dismiss Plaintiffs' claims in their entirety. *See supra* Sections I–IV. Should any claim survive outright dismissal, this Court should at least dismiss that claim as to the particular defendants and forms of relief discussed in Section V.

Dated:  August 10, 2026

Respectfully submitted,

/s/  Sona Rewari
Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
(202) 955-1974
(703) 918-4018 (facsimile)
srewari@hunton.com

David M. Parker (VSB No. 85619)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
(804) 788-8718
(804) 788-8218 (facsimile)
dparker@hunton.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Sona Rewari
Sona Rewari