**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **JOHN DOE, *et al.*,**<br><br>*Plaintiffs*,<br><br>v.<br><br>**SCHOOL BOARD FOR FAIRFAX COUNTY PUBLIC SCHOOLS, *et al.*,**<br><br>*Defendants*. | Case No. 1:26-cv-01541<br><br>District Judge Anthony J. Trenga<br>Magistrate Judge Ivan D. Davis |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs, by and through undersigned counsel, respectfully submit this response in opposition to Defendants' motion to dismiss.

## TABLE OF CONTENTS


TABLE OF CONTENTS ..... II

TABLE OF AUTHORITIES ..... III

INTRODUCTION ..... 1

BACKGROUND ..... 2

A. Plaintiffs Participate in a Harmless Viral Trend Used Among Student Groups. ..... 2

B. Outside Influencers Impose an Islamophobic Political Meaning on the Video ..... 3

C. Defendants Adopt the Outside Characterization Before Investigating. ..... 4

D. FCPS Upholds the Discipline, Which Continues to Harm Plaintiffs. ..... 6

STANDARD OF REVIEW ..... 7

ARGUMENT ..... 7

I. DEFENDANTS VIOLATED THE FIRST AMENDMENT. ..... 7

A. The Complaint Alleges Neither Substantial Disruption nor Facts to Support a Reasonable Forecast of It. ..... 9

B. The Complaint Plausibly Alleges Viewpoint Discrimination. ..... 11

II. PLAINTIFFS PROPERLY ALLEGE AN EQUAL PROTECTION VIOLATION ..... 12

A. Plaintiffs were punished when similarly situated students were not. ..... 13

B. Plaintiffs have alleged discriminatory intent. ..... 16

III. PLAINTIFFS PROPERLY ALLEGE A TITLE VI VIOLATION. ..... 19

IV. PLAINTIFFS PROPERLY ALLEGE A PROCEDURAL DUE PROCESS CLAIM. ..... 19

A. Plaintiffs have a property interest that was infringed by their suspensions ..... 20

B. Plaintiffs have a liberty interest in their reputations that was infringed by Defendants. ..... 22

C. Plaintiffs properly allege that they did not receive basic due process. ..... 24

V. DEFENDANTS REID AND MUKAI WERE PERSONALLY INVOLVED IN THE DEPRIVATION OF PLAINTIFFS' RIGHTS. ..... 26

VI. FCPS RATIFIED THE UNCONSTITUTIONAL ACTS TAKEN AGAINST PLAINTIFFS AND IS LIABLE AS A MUNICIPALITY UNDER MONELL. ..... 27

VII. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. ..... 28

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Pastides*,
900 F.3d 160 (4th Cir. 2018) .................... 28

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .................... 19

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .................... 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................... 26

*Berger v. Battaglia*,
779 F.2d 992 (4th Cir. 1985) .................... 10

*Castorina v. Madison County School Board*,
246 F.3d 536 (6th Cir. 2001) .................... 8

*Sciolino v. City of Newport News*,
480 F.3d 642 (4th Cir. 2007)) .................... 23, 24, 26

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .................... 25

*Coalition for TJ v. Fairfax Cnty. Sch. Bd.*,
68 F.4th 864 (4th Cir. 2023) .................... 17

*Cole v. Newton Special Mun. Separate Sch. Dist.*,
676 F.Supp. 749 (S.D. Miss. 1987) .................... 21

*D.B. v. Cardall*,
826 F.3d 721 (4th Cir. 2016) .................... 19

*Davison v. Randall*,
912 F.3d 666 (4th Cir. 2019) .................... 11

*Doe v. Fairfax County School Bd.*,
403 F. Supp. 3d 508 (E.D.V.A. 2019) .................... 13, 14, 25

*Doe v. Marshall Univ. Bd. of Govn'rs*,
683 F. Supp. 3d 522 (S.D.W.V. 2023) .................... 13

*Doe v. Rector & Visitors of George Mason Univ.* (*GMU*),
149 F. Supp. 3d 602 (E.D. Va. 2016) .................... 19, 22, 23

*Doe v. Settle*,
24 F.4th 932 (4th Cir. 2022)....................13

*Goss v. Lopez*,
419 U.S. 565 (1975)....................19, 20, 24

*Hardwick ex rel. Hardwick v. Heyward*,
711 F.3d 426 (4th Cir. 2013).................... 7, 8, 9, 10, 29

*Heward v. Bd. of Educ. of Anne Arundel County*,
2023 WL 6381498 (D. Md. Sept. 29, 2023)....................29

*Heyne v. Metro. Nashville. Pub. Sch.*,
655 F.3d 556 (6th Cir. 2011)....................29

*Hope v. Pelzer*,
536 U.S. 730 (2002)....................28

*Katti v. Arden*,
161 F.4th 217 (4th Cir. 2025)....................12, 13, 15

*Laney v. Farley*,
`501 F.3d 577 (6th Cir. 2007) ....................20, 21, 22

*Lee v. City of South Charleston*,
2009 WL 2602378 (S.D.W.V. Aug. 21, 2009) ....................16

*Leroy v. Livingston Manor Cent. Sch. Dist.*,
158 F.4th 414 (2d Cir. 2025)....................10

*M.B. by & through Brown v. McGee*,
2017 WL 1364214 (E.D. Va. Mar. 24, 2017)....................23

*Mahanoy Area School District v. B.L.*,
594 U.S. 180 (2021).................... 9, 11

*Marquez v. Mesa Vista Consol. Schs.*,
2004 WL 7337820 (D.N.M. Aug. 31, 2004) ....................20

*McLaurin v. Oklahoma St. Regents for Higher Educ.*,
339 U.S. 637 (1950)....................29

*Monell v. Dept. of Social Services of City of New York*,
436 U.S. 658 (1978)....................27

*Morgan v. Swanson*,
659 F.3d 359 (5th Cir. 2011)....................8

*Morrison v. Garraghty*,
239 F.3d 648 (4th Cir. 2001) ....................17

*Newsom ex rel. Newsom v. Albemare County Sch. Bd.*,
354 F.3d 249 (4th Cir. 2003) ....................10

*Nichols v. Bumgarner*,
173 F.4th 511 (4th Cir. 2026) ....................28

*Nordlinger v. Hahn*,
505 U.S. 1 (1992) ....................12

*O.W. by next fried Bass v. School Bd. of City of Virginia Beach*,
656 F. Supp. 3d 596 (E.D.V.A 2023) ....................13

*Patrick v. Success Acad. Charter Schs., Inc.*,
354 F. Supp. 3d 185 (E.D.N.Y. 2018) ....................21

*Peters v. Jenney*,
327 F.3d 307 (4th Cir. 2003) ....................19

*R.M.B. v. Bedford Cnty. (Virginia) Sch. Bd.*,
169 F. Supp. 3d 647 (W.D. Va. 2016) ....................20

*Riddick v. Barber*,
109 F.4th 639 (4th Cir. 2024) ....................28

*Ridley v. Massachusetts Bay Transportation Authority*,
390 F.3d 65 (1st Cir. 2004) ....................12

*Ridpath v. Bd. of Governors Marshall Univ.*,
447 F.3d 292 (4th Cir. 2006) .................... 22, 23

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) ....................11

*See Satanic Temple, Inc. v. Saucon Valley Sch. Dist.*,
671 F.Supp.3d 555 (E.D. Penn. 2023) .................... 8, 14

*Shirvinski v. U.S. Coast Guard*,
673 F.3d 308 (4th Cir. 2012) ....................22

*Sons of Confederate Veterans, Inc. ex rel. Griffin v. Commissioner of Virginia Department of Motor Vehicles*,
288 F.3d 610 (4th Cir. 2002) ....................12

*Starbuck v. Williamsburg James City Sch. Bd.*,
28 F.4th 529 (4th Cir. 2022) ....................27

*Sylvia Dev. Corp. v. Calvert Cnty., Md.*,
48 F.3d 810 (4th Cir. 1995) .......... 17, 18, 29

*Texas v. Johnson*,
491 U.S. 397 (1989) .......... 11

*Thompson v. Virginia*,
878 F.3d 89 (4th Cir. 2017) .......... 28

*Tinker v. Des Moines Indep. Comm. Sch. Dist.*,
393 U.S. 503 (1969) .......... 7, 9, 10, 14

*Velez v. Levy*,
401 F.3d 75 (2d Cir. 2005) .......... 24

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943) .......... 12

*Williamson v. Stirling*,
912 F.3d 154 (4th Cir. 2018) .......... 26

*Zamencik v. Indian Prairie Sch. Dist. # 204*,
636 F.3d 874 (7th Cir. 2011) .......... 8, 9

# INTRODUCTION

Fairfax County Public Schools and its administrators punished Plaintiffs—Muslim and Arab students at Thomas Jefferson High School for Science and technology—for participating in the same viral trend that other FCPS student groups participated in without consequence. Outside agitators treated Plaintiffs' skit, in combination with the ordinary religious and Palestinian clothing they wore, as depicting terrorism and demanded that FCPS take action. FCPS immediately capitulated.

By their own admission, Defendants viewed Plaintiffs' video as "menacing" because Plaintiffs wore Palestine-related clothing. Defendants' description of Plaintiffs and their actions mirrored the allegations made by hostile and Islamophobic outside groups. Defendants then imposed harsh punishments on Plaintiffs, including suspensions, marks on their permanent records, and a permanent restriction on one Plaintiff from wearing a Palestinian sweatshirt. Even after Defendants learned that other student groups had participated in similar or identical skits, they persisted to only punish Plaintiffs.

Not only did Defendants treat Plaintiffs differently than similarly situated students of other national and religious backgrounds, but Defendants' investigatory process revealed they had pre-determined Plaintiffs' culpability. Before the investigation even began, Defendant Fawsett admitted that her inquiry would be a search for "the proper code violation." Defendant Mukai publicly branded Plaintiffs' conduct as an act of "antisemitism" the same day. Defendants then used their "investigation" to determine *how* Plaintiffs would be punished, not whether they should be punished.

Defendants' now ask the Court to recast the hostile reaction to Plaintiffs' identities and expression as an in-school "disruption," to disregard the disparate treatment and due process failures apparent from the face of the Complaint, and to credit Defendants' post hoc justifications for a predetermined decision. Rule 12(b)(6) permits none of that. The Complaint plausibly alleges that Defendants punished protected expression, intentionally discriminated against Plaintiffs, and denied

them a fair process. The Motion should be denied.

## BACKGROUND

### A. Plaintiffs Participate in a Harmless Viral Trend Used Among Student Groups.

Plaintiffs are students at Thomas Jefferson High School for Science and Technology ("TJHSST") and members of its Muslim Student Association ("MSA"). Complaint, Dkt. 8-1 ¶¶ 7–10, 28-29, 34-35, 40, 47.[1] MSA holds weekly meetings, open to all students, at which students pray, learn, socialize, and plan community events. *Id.* ¶¶ 22–25.

In October 2025, MSA sought ways to increase attendance at weekly meetings. *Id.* ¶¶ 51–52. Plaintiffs and other students decided to use a skit from a viral trend, used by student groups nationwide. *Id.* ¶¶ 53–56. In the skit, a student is asked whether they plan to attend an upcoming event; if the student says no, members of the sponsoring organization theatrically grab and carry the student away ("kidnap" them). *Id.* ¶¶ 53–54. A second student is then asked if they plan to attend the event and enthusiastically agree. *Id.*

The viral skit was already in use within FCPS, giving Plaintiffs no indication their video would be received negatively. *Id.* ¶¶ 57–60. The Indian Student Association at Chantilly High School ("ISA"), for example, posted a version in which students who declined to attend a meeting were put into the trunk of a car. *Id.* ¶ 57. Neither FCPS nor Chantilly High School investigated or reprimanded that group. *Id.* ¶ 58. At TJHSST, the Student Government Association ("SGA") posted a similar video in which students threw a "grenade" into a classroom. *Id.* ¶ 60. As evidenced, outlandish comedy skits were in the school and district. *Id.* ¶¶ 1, 59, 61.

Plaintiffs filmed MSA's skit on October 23, 2025, in the school's prayer room. *Id.* ¶ 62. In the video, Plaintiff Jane Doe asks two MSA students whether they plan to attend the next meeting. *Id.* ¶ 63. When the students say no, Plaintiffs John Doe and Richard Roe appear and grab them, placing

---

[1] John Doe graduated and Colin Coe transferred to another school in Fairfax County Public Schools.

one in a bin and taking both behind a large curtain. *Id.* ¶ 64. Jane Doe then asks two other students the same question, and those students enthusiastically respond "yes." *Id.* ¶ 65. The atmosphere of the video was comedic and joyful: the students repeatedly struggled to contain their laughter, and the video ends by showing the two "grabbed" two students smiling broadly and giving the camera a "thumbs-up." *Id.* ¶¶ 66–67.

Plaintiffs' skit itself contained no weapons, threats, or references to any real-world place or event outside of the meeting MSA was promoting. *Id.* ¶¶ 69–72. Plaintiffs did not wear costumes or bring political "props"—all participants wore and used their ordinary school clothing. *Id.* ¶ 73. Colin Coe, who is Palestinian, wore a sweatshirt depicting the historic outline of Palestine in the colors of the Palestinian flag. *Id.* ¶¶ 74–75. Coe regularly wore the sweatshirt to school, including for his school yearbook photo. *Id.* ¶¶ 75–76. Richard Roe wore a sweatshirt displaying the Crescent Moon and Star, a widely recognized symbol of Islam, as well as a keffiyeh—a garment associated with Palestine. *Id.* ¶¶ 77–78. Jane Doe wore her hijab and a sweatshirt with a keffiyeh pattern on its hood. *Id.* ¶ 79. None of this attire had previously caused any issue. *Id.* ¶¶ 75–76, 180.[2]

**B. Outside Influencers Impose an Islamophobic Political Meaning on the Video.**

MSA posted the video to its Instagram account on Friday, October 24, 2025 with a caption welcoming people to the next meeting. *Id.* ¶ 80. The video initially received no significant response or engagement. *Id.* ¶ 81. However, two days later, right-wing influencer, Asra Nomani, reposted MSA's video with a caption that referenced October 7 and suggested MSA was "glorif[ying] Hamas." *Id.* ¶¶ 82–84. Nomani was known to MSA, having previously targeted their events, described keffiyehs as

[2] Defendants claim that Plaintiffs "used props and displayed a political symbol associated with the October 7 attack on Israel." Dkt. 26 at 1. That statement is false and inappropriate for a motion to dismiss. Plaintiffs never allege any association between their clothing and October 7th, Compl. ¶ 54, and specifically call out that characterization to be "untrue, anti-Palestinian, and [an] Islamophobic trope." *Id.* ¶ 127.

"anti-Israel garments," and called an MSA event on Gaza "antisemitic." *Id.* ¶ 84. Her post attracted attention from other influencers known for anti-Palestinian and Islamophobic content, who latched onto and repeated Nomani's accusations that MSA was depicting "terrorism" and went so far as to call for the students' deportation. *Id.* ¶¶ 85–88.

Nomani's claims spread to a TJHSST parent WhatsApp group, where one person claimed to have reported MSA's skit to TJHSST, FCPS, and the Virginia Attorney General. *Id.* ¶ 90. Several other people responded to suggest the original complainant may be overreacting. *Id.* ¶¶ 90–91.

On Monday, October 27, 2025, the Jewish Community Relations Council ("JCRC") issued a public statement demanding that FCPS discipline Plaintiffs and announcing that it had been in contact with "the highest levels of FCPS leadership' to demand accountability. *Id.* ¶¶ 92–93.[3] A JCRC representative later explained that her principal objection to the video was Colin's sweatshirt, which she characterized as a "map of Israel" covered by Palestinian colors. *Id.* ¶ 94. The video generated no significant reaction when MSA posted it; the controversy arose only after outside actors recast an ordinary comedy skit and the students' everyday religious and cultural clothing as references to Hamas and October 7. *Id.* ¶¶ 73–94.

### C. Defendants Adopt the Outside Characterization Before Investigating.

TJHSST officials summoned Plaintiffs to the front office on Monday, October 27, the first school day after Nomani's post. *Id.* ¶¶ 82, 96. Defendant Associate Principal Elizabeth Fawsett questioned each student individually and asked, among other things, whether the students had intended to make the video "look violent." *Id.* ¶¶ 97–99. Plaintiffs attempted to explain that their skit

---

[3] A JCRC representative was later quoted to say, "On the Sunday night when that mock-kidnapping video was going around like wildfire on social media, I got an immediate response. The school's reaction was the same as mine; not one person on the management team thought it was OK." Amy E. Schwartz, *Opinion Interview with Guila Franklin Siegel | A Sledgehammer Is Not Always the Answer*, MOMENT (Feb. 2, 2026), https://momentmag.com/franklin-siegel-antisemitism-progress/.

merely used a viral format used by several other FCPS groups and showed her the similar FCPS skits. *Id.* ¶¶ 99, 104, 164. Fawsett said that she would investigate those videos and groups. *Id.* ¶ 104.

Plaintiffs were held in the front office until their parents arrived to take them home. Defendant Fawsett told John Doe's father that the disciplinary decision was hers to make and that she was simply looking for "the proper code violation." *Id.* ¶ 103.

That same day, the CAIR informed Principal Mukai and Superintendent Reid that the students had participated in a popular social-media trend, that other student groups had posted similar videos without consequence, and that the campaign demanding punishment was using openly anti-Arab and Islamophobic rhetoric. *Id.* ¶ 106. Defendants did not respond. *Id.* Instead, and before the investigation had concluded, Mukai sent an email to approximately two thousand TJHSST families publicly describing the MSA video as an act of "antisemitism." *Id.* ¶ 107.

Beginning the next morning, Tuesday, Defendants placed Plaintiffs and four other students in a small, windowless "Alternative Instructional Area" room from 8:00 a.m. until 4:00 p.m. *Id.* ¶¶ 108–09. They were prohibited from speaking to one another and were denied access to their teachers and other instructional assistance. *Id.* ¶¶ 110–14. When Plaintiffs raised concerns about the conditions and identified violations of the Student Rights and Responsibilities handbook, those concerns were not remedied. *Id.* ¶¶ 113, 133. They were held under these conditions, equivalent to an "in-school" suspension, through Thursday, October 30. *Id.* ¶¶ 114, 120.

On October 30, Fawsett informed Plaintiffs' parents that the investigation was complete and imposed one week of in-school suspension. *Id.* ¶¶ 120–21. The suspension notice stated that the video used "imagery and symbols reasonably interpreted as menacing, hostile, and intimidating," but did not identify any facts distinguishing MSA's skit from the similar videos posted by other student groups. *Id.* ¶¶ 122–23.

The notice also identified what it termed "Eliminationist Symbols." *Id.* ¶ 124. It described

Coe's sweatshirt as "a map of the state of Israel covered entirely by a Palestinian flag" and declared it a symbol "widely interpreted as an eliminationist message against all Jews in the state of Israel." *Id.* That description was substantively identical to the one offered by the JCRC representative who appeared in local media to denounce Coe's sweatshirt and Plaintiffs' video. *Id.* ¶¶ 94, 124–25.

Defendants never asked Coe about his sweatshirt, what it meant, or why he wore it. *Id.* ¶ 126. Coe wore the sweatshirt because he is Palestinian and wishes to express his Palestinian identity and support for Palestinian freedom and statehood. *Id.* ¶¶ 74–76, 126. Defendants nevertheless instructed him that he could no longer wear the sweatshirt to school. *Id.* ¶ 130. After filing this lawsuit, Defendants reversed course and reached an agreement with Plaintiffs to allow Coe to wear the sweatshirt while this lawsuit is ongoing. *See* Stipulation, Dkt. 18.

Other FCPS student groups that posted the same kind of skit or video were never punished. *Id.* ¶¶ 1, 58–60, 104–05, 164.

**D. FCPS Upholds the Discipline, Which Continues to Harm Plaintiffs.**

Plaintiffs served the final three days of their suspensions in the same small, windowless room, without meaningful access to their teachers or instructional assistance. *Id.* ¶¶ 132–34. They fell behind academically and were prohibited from participating in extracurricular activities. *Id.* ¶¶ 133–35. *Id.* ¶¶ 141, 142,148, 153, 155, 157. Richard Roe lost his 4.0 GPA and was disqualified from TJHSST's senior internship program. *Id.* ¶¶ 148–52. Jane Doe missed an exam and several quizzes that she was not allowed to retake. *Id.* ¶ 157. Plaintiffs' infractions will also require a School Counselor's note to accompany any transcript sent to an institute of higher learning. *Id.* ¶ 149.

Plaintiffs' parents subsequently filed a formal complaint with FCPS challenging both the disciplinary decision and the conditions of the students' suspension. *Id.* ¶¶ 136–37. In February 2026, FCPS issued a written response finding no wrongdoing and affirmatively stating that "the administration's actions were consistent with FCPS regulations." *Id.* ¶¶ 138–39.

The punishment also chilled Plaintiffs' and other MSA members' expression. *Id.* ¶¶ 143–46, 156, 159(e). MSA members abandoned plans to make another promotional video for Eid because they feared renewed public harassment and school discipline, and attendance at MSA meetings declined substantially after several students cited concerns about retaliation. *Id.* ¶¶ 145–46. Meanwhile, Coe fears that he will again be punished for wearing clothing reflecting his Palestinian identity. *Id.* ¶ 156.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege sufficient facts to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, the Court does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," but accepts well-pleaded factual allegations as true and draws all reasonable inferences in Plaintiffs' favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (cleaned up).

## ARGUMENT

### I. Defendants Violated the First Amendment.

The fatal flaw in Defendants' attempt to dismiss Plaintiffs' First Amendment claim is their mistaken belief that an audience's hostile reaction to speech satisfies the "substantial disruption" prong of *Tinker*. *See* Defs.' Motion to Dismiss, Dkt. 26 at 17–18. But *Tinker* and its progeny make clear that hostile and even hysterical responses—like those alleged here—do not amount to a substantial disruption or the threat of one. *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 514 (1969). Indeed, "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference *with schoolwork or discipline*, is not constitutionally permissible." *Id.* (emphasis added). In the absence of actual disruption in the school and classroom environment, the question is whether school officials reasonable forecasted that Plaintiffs' expression would materially disrupt schoolwork or invade the rights of others. *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435, 439–40 (4th Cir. 2013).

The Complaint alleges no such facts. It alleges that Plaintiffs participated in a familiar, viral promotional skit used by other FCPS student groups without any incident; that their video contained no threat or reference to any real-world political group or event; and that Plaintiffs had repeatedly worn the same Palestine-related clothing to school without disruption. Compl. ¶¶ 51–79.

The controversy arose only after outside actors, outside of the classroom environment, invidiously attributed a threatening meaning to Plaintiffs' expression and demanded their punishment. *Id.* ¶¶ 80–107. That hostile audience reaction, standing alone, cannot form the basis of forecasted substantial disruption. *See Satanic Temple, Inc. v. Saucon Valley Sch. Dist.*, 671 F.Supp.3d 555, 577 n.2 (E.D. Penn. 2023) ("[T]his school setting exception to the First Amendment's general prohibition against suppressing speech based on negative reactions from listeners (the 'heckler's veto') is designed to address only situations where student speech causes internal disruption and disorder."). A disruption wholly external to the classroom, that does not touch the "immature captive audience" of the student body or "their studies," is a type of disruption that falls outside of *Tinker's* reach and thus outside the scope of the school official's reasonable consideration. *Zamencik v. Indian Prairie Sch. Dist. # 204*, 636 F.3d 874, 880 (7th Cir. 2011).

Defendants also fatally ignore the independent prohibition against viewpoint discrimination. Courts disagree on whether a school restriction must be both viewpoint neutral and justified under *Tinker*, or whether *Tinker* subsumes the viewpoint-neutrality inquiry. *Compare Castorina v. Madison County School Board*, 246 F.3d 536, 544 (6th Cir. 2001), *with Morgan v. Swanson*, 659 F.3d 359, 379 (5th Cir. 2011). The Fourth Circuit has not resolved that question. *Heyward*, 711 F.3d at 443–44. While Defendants fail to address the tension between *Tinker* and subsequent precedent concerning viewpoint discrimination, this Court need not resolve that tension because the Complaint plausibly alleges both that Defendants discriminated against Plaintiffs' viewpoint and that their expression caused no actual or reasonably forecasted substantial disruption.

### A. The Complaint Alleges Neither Substantial Disruption nor Facts to Support a Reasonable Forecast of It.

*Tinker* permits speech restrictions only upon evidence that student expression materially and substantially interfered with schoolwork or discipline, or facts supporting a reasonable forecast of such interference. *Tinker*, 393 U.S. at 509, 513–14; *Heyward*, 711 F.3d at 435, 439–40. *Tinker*'s "demanding standard" expressly limits the school-setting exception to speech that "materially disrupts classwork or involves substantial disorder" to school activities. *Mahanoy Area School District v. B.L.*, 594 U.S. 180, 192–93 (2021) (finding no justification for speech restriction without evidence of disruption "of a school activity or a threatened harm to the rights of others") (emphasis added). A school may not act merely on "undifferentiated fear or apprehension of disturbance" or a "desire to avoid the discomfort accompanying an unpopular viewpoint." *Tinker*, 393 U.S. at 508-09. Yet here, Defendants point only to undifferentiated hysteria.

Plaintiffs allege no disruption of classes, schoolwork, discipline, or a school activity caused by Plaintiffs' expression. The video initially received no significant response. Compl. ¶¶ 80–81. Two days later, outside influencers reposted it with hysterical anti-Palestinian and Islamophobic accusations. *Id.* ¶¶ 82–89. One parent reported it; other parents said she was overreacting. *Id.* ¶¶ 90–91. An outside organization contacted FCPS leadership on a weekend evening, demanded punishment, and criticized Coe's sweatshirt in the media. *Id.* ¶¶ 92–94. These reactions come nowhere close to the "substantial disruption" that *Tinker* contemplates.

On the contrary, when school officials act on precisely that sort of hostile hysteria, they are imposing an unconstitutional heckler's veto rather than legitimately anticipating a substantial disruption. *See Zamencik*, 636 F.3d at 880. The Fourth Circuit has warned against government efforts to "buy its peace" by suppressing expression in response to "disruption . . . caused not by the speech itself but by threatened reaction to it by offended segments of the public." *Berger v. Battaglia*, 779 F.2d

992, 1001 (4th Cir. 1985). So too here: outsiders mischaracterized Plaintiffs' expression, demanded punishment, received an immediate response, and supplied the interpretation Defendants later adopted. Compl. ¶¶ 82–107, 122–28.

Defendants' claim that the real disruption was already present, and outsiders merely "amplified" a foreseeable consequence of Plaintiffs' expression. Dkt. 26 at 19. But administrators can only "reasonable forecast" a disruption based on facts. *Heyward*, 711 F.3d at 435. Here, no alleged facts support Defendants' inverted timeline. Where no record exists of "past disruptive incidents arising out of speech" similar to the restricted expression, a school has "failed to establish a sufficient likelihood of disruption." *Newsom ex rel. Newsom v. Albemare County Sch. Bd.*, 354 F.3d 249, 259 n.7 (4th Cir. 2003). The facts instead point the opposite direction. Plaintiffs' clothing had been worn repeatedly without incident—Coe even wore his sweatshirt in his yearbook photograph. Compl. ¶¶ 73–79. Other FCPS groups posted the same or similar skits without incident or discipline. *Id.* ¶¶ 53–60. Unlike *Hardwick*, which involved repeated, racially charged incidents and past in-school disruptions, 711 F.3d at 438–40, Defendants have nothing—and no reasonable justification. *Newsom*, 354 F.3d at 259 n.7.

The skit itself supports no contrary inference. The students were giggling, joking and smiling; the "grabbed" students reappeared to give a warm "thumbs-up;" and the only message was an invitation to an MSA meeting. Compl. ¶¶ 63–72. No one was threatened or targeted. *Id.* ¶¶ 69–71.

Although intent is not dispositive under *Hardwick*, context remains central to whether a forecast was reasonable. Even if some "disruption" identified by FCPS were to touch the school setting, it was still not the "*kind* of disruption . . . . 'disorder or disturbance *on the part of the* [Plaintiffs]'" envisioned by *Tinker*. *See Leroy v. Livingston Manor Cent. Sch. Dist.*, 158 F.4th 414, 425–26 (2d Cir. 2025) (quoting *Tinker*, 393 U.S. at 508) (emphasis original). At best, Defendants were responding to the racist outrage of third-party groups online, pointing to "disruption . . . driven by the independent decision-making of others" rather than the actions of Plaintiffs themselves. *Id.* at 425.

Defendants' reliance on the "rights of others" language from *Tinker* fares no better. *See* Dkt. 26 at 17-18. Plaintiffs allege no threat, harassment, or interference with any other student's education—and none existed. *See* Compl. ¶¶ 82–94, 122–28. Even so, the emotive impact of speech on its audience does not remove it from First Amendment protection. *Texas v. Johnson*, 491 U.S. 397, 412 (1989); *Mahanoy Area School Dist.*, 594 U.S. at 210 (Alito, J. concurring) ("The school did not claim that the messages caused any significant disruption of classes. The most it asserted along these lines was that they 'upset' some students.").

At bottom, treating any claim of fear as sufficient for a finding of "disruption" would nullify *Tinker's* reasonableness requirement and authorize "one of the most persistent and insidious threats to first amendment rights"—the heckler's veto. *Berger*, 779 F.2d at 1001. As alleged, the school and school district's suppression was undertaken to "buy . . . peace" for its administrators, not its students.

**B. The Complaint Plausibly Alleges Viewpoint Discrimination.**

Defendants make no attempt to address the viewpoint discrimination pled by Plaintiffs. Viewpoint discrimination occurs when the state acts because of "the opinion or perspective of the speaker" and is presumptively impermissible if the speech is otherwise permitted in the forum. *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 829–30 (1995). It is apparent where an official's action was "impermissibly motivated by a desire to suppress a particular point of view." *Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019). Plaintiffs allege exactly that.

The reasons Defendants gave for punishing Plaintiffs were viewpoint-specific on their face. Defendants' Suspension Notices expressly condemned Plaintiffs' "imagery and symbols" and falsely labeled Coe's Palestine map and flag an "Eliminationist Symbol" purported to be "widely interpreted as an eliminationist message against all Jews in the state of Israel." Compl. ¶¶ 122–28. But Plaintiffs' statements were simply self-expressive in an otherwise unrelated, innocuous promotional video. *See id.* ¶¶ 63–79. Rather than engage with Plaintiffs' actual intentions, Defendants adopted one specific

and disputed political interpretation of a Palestinian student's expression and made it an official orthodoxy, with which disagreement leads to punishment. The Constitution forbids this. *See West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943) (public officials cannot prescribe what is orthodox "in politics, nationalism, religion, or other matters of opinion.").

Defendants' motion repeats the problem rather than answering it. It spuriously calls Plaintiffs' clothing "symbols associated with the October 7 attack." Dkt. 26 at 19. Plaintiffs allege that is not only untrue, but anti-Palestinian and Islamophobic, Compl. ¶¶ 73–79, 127, 178, 180, and at this stage of proceedings Defendants' interpretation bears no weight. Indeed, Defendants appear not to believe their own words. Betraying their characterization of Coe's Palestine sweatshirt as an "Eliminationist Symbol" and a threat to Jewish students, Defendants have freely stipulated to allow Plaintiff Coe to wear the Palestine sweatshirt to school while this litigation is pending. *See* Dkt. 18.

As further evidence of viewpoint discrimination, Plaintiffs allege differential treatment of similar conduct. ISA at Chantilly High School in FCPS posted a substantially identical video in which students were humorously "black bagged" and put in a trunk. Compl. ¶¶ 53–58. TJHSST's SGA posted a skit mimicking the use of a grenade. *Id.* ¶¶ 59–60. Neither group was disciplined. *Id.* ¶¶ 58, 104–05. Yet Defendants labeled Plaintiffs' skit menacing and antisemitic, and punished every participant. *Id.* ¶¶ 107, 121–30. The reasonable conclusion is that Defendants' "menacing" claims were mere pretext for viewpoint suppression. *See Sons of Confederate Veterans, Inc. ex rel. Griffin v. Commissioner of Virginia Department of Motor Vehicles*, 288 F.3d 610, 624 (4th Cir. 2002); *Ridley v. Massachusetts Bay Transportation Authority*, 390 F.3d 65, 86 (1st Cir. 2004).

## II. Plaintiffs Properly Allege an Equal Protection Violation.

Plaintiffs allege that Defendants treated them differently than similarly situated FCPS students because of their race and religion. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see Katti v. Arden*, 161 F.4th 217, 226 (4th Cir. 2025). To plead an equal protection violation, a plaintiff must show that (1)

the defendant treated him differently than a person "similarly situated in all relevant aspects," and (2) the discriminatory treatment was intentional. *Katti*, 161 F.4th at 226 (quoting *Doe v. Settle*, 24 F.4th 932, 939 (4th Cir. 2022)). Defendants' contention that Plaintiffs fail to satisfy these requirements is a result of the over-parsing of comparator circumstances and the misreading of Plaintiffs' Complaint.

**A. Plaintiffs were punished when similarly situated students were not.**

Defendants punished Plaintiffs, but no other students or groups who made the same promotional videos. Similarities between comparators do not require identical circumstances, just similarities for *relevant* aspects. *See Katti*, 161 F.4th at 226 (requiring similar qualities between comparators). The comparator's circumstances must be "without such differentiating or mitigating circumstances that would distinguish either the conduct or the[school's] treatment of [the students]." *Doe v. Fairfax County School Bd.*, 403 F. Supp. 3d 508, 516 (E.D.V.A. 2019); *see also Doe v. Marshall Univ. Bd. of Govn'rs*, 683 F. Supp. 3d 522, 540 (S.D.W.V. 2023) (finding that students were similarly situated because Plaintiff alleged they were both students who filed Title IX complaints).

FCPS "singled out" Plaintiffs for the promotional videos they made where others who made the same kind of promotional videos were not disciplined. *See O.W. by next fried Bass v. School Bd. of City of Virginia Beach*, 656 F. Supp. 3d 596, 619 (E.D.V.A 2023) (quoting *United States v. Greenwood*, 796 F.2d 49, 52 (4th Cir. 1986)). Plaintiffs are similar to the other groups in all relevant ways. Each of the three groups were recognized clubs in the FCPS system. *See* Compl. ¶¶ 57, 60. Each filmed a promotional video on its school affiliated social media pages. *See* id. And each video included students feigning acts of violence in a comedic skit. Id. Defendants recognized and were aware of each of these videos—and likely other similar videos. *See id.* ¶ 104; Ex. 2, Dkt. 26-2. But only Plaintiffs were punished.

Defendants identify several ways that Plaintiffs' proffered comparators are distinct from Plaintiffs situation—each fails.

1. *Indian Student Association at Chantilly High School*

As a comparator, the video made by ISA at Chantilly High School is compelling. First, the findings in Plaintiffs' disciplinary letters could be almost exactly transposed to describe ISA's video. Both videos portrayed students grabbed and placed in containers—for ISA, the trunk of a car—which the administration could "reasonably interpret as imagery simulating forced confinement and violence, including the depiction of captives being hidden away." Ex. 3, Dkt. 26-3. Defendants give no reason why both videos could not be "reasonably interpreted as menacing, hostile, and intimidating towards members of the community." Ex. 3 at 2. Plaintiffs' suspension letter does not limit the scope of the alleged conduct violation to "eliminationist symbolism"—which Defendants continue to allow on FCPS's campuses, either by policy or stipulation. *See* Dkt. 18. And it only implicates that message through Plaintiff Coe's sweatshirt, which the school took no issue with prior to the disciplinary action and has now expressly agreed to allow. *See id.*; Ex. 3 at 2.; Compl. ¶¶ 73–76.

First, one student's clothing is not sufficient to differentiate the videos. Both groups of students were wearing normal school or street clothing. Compl. ¶¶ 73–76. Their clothing does not distinguish or mitigate Plaintiffs' conduct or Defendants' treatment of them. *Doe*, 403 F. Supp. 3d at 516. To the extent that it does distinguish Plaintiffs' conduct from ISA, it only furthers Plaintiffs' claims of discriminatory treatment because it shows that Defendants viewed Plaintiffs as dangerous and "menacing" because of their expression of faith and national origin. *See* Compl. ¶ 122.

Second, Defendants' argument that public "outcry" differentiates Plaintiffs' video from the others only highlights the discriminatory nature of Defendants actions and does not diminish ISA as comparator. *See* Dkt. 26 at 12. A decision to regulate something on the basis of audience reaction is a decision to regulate its contents. *See Satanic Temple*, 671 F.Supp.3d at 577 n.2; *see Tinker*, 393 U.S. at 508–09. This Court should decline Defendants' invitation to separate the contents of Plaintiffs' video from the reaction to it, especially where Defendants have acknowledged that the "traumatizing"

effects to the community are not limited to Plaintiffs videos and the outcry was based in discriminatory animus.[4] Dkt. 26-2 at 1; *see supra* Part II.B.

Third, Defendants unconvincingly argue that ISA's outside filming location differentiates it from MSA's inside location. Defendants do not elaborate on why location of filming differentiates one video from another. Both videos were posted by student groups on accounts affiliated with FCPS. Compl. ¶¶ 57, 80. Both were filmed on school grounds—one in a parking lot and one in a prayer room. *See id.* ¶¶ 57, 62. But even if ISA had filmed its skit off campus, Defendants still could have investigated and punished the students. *See Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 687 (4th Cir. 2018) (rejecting school's argument that they could not punish students who posted anonymously on social media).

Next, Defendants' argument that Fawsett was unable to punish ISA misreads Plaintiffs' allegations. Dkt. 26 (citing *Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355, 368 n. 16 (E.D. Va. 2004). Plaintiffs allege that FCPS administrators, not simply TJHSST administrators, were involved in punishing MSA and engaged in discriminatory conduct. *See* Compl. ¶ 93. Plaintiffs allege that Superintendent Reid and the FCPS School Board reviewed and ratified the disciplinary conduct imposed by TJHSST. Compl. ¶¶ 11, 13, 136–39. Defendants easily could have investigated or punished ISA for its materially similar conduct, but refused.

*2. Student Government Association at TJHSST*

Defendants wrongly argue that SGA's skit is an invalid comparator because its content was not essentially identical. Dkt. 26 at 12. But comparator cases do not need to be identical. *See Katti*, 161 F.4th at 226. Here, SGA's video was filmed by students, on campus, and posted on TJHSST affiliated

[4] In fact, in other contexts, courts have only considered such factors where the public criticism had some reputational impact on the defendant. *See e.g.*, *Jackson v. Rooney*, No. 13-cv-1706, 2016 WL 4769717, at *11 (D. Conn. 2016) (firing an employee whose criminal record associated with dishonesty hurt the reputation of the department).

accounts. *See* Compl. ¶ 60. SGA's skit, involving a fake hand grenade thrown into a TJHSST classroom to promote recent school renovations, maintains the same quality of cartoonish "violent" imagery. *See* Compl. ¶¶ 60, 122. Referring back to Defendants' Notice to Plaintiffs, the SGA video was equally (if unreasonably) guilty of "utilize[ing] imagery reasonably interpreted as menacing, hostile, and intimidating towards members of the school community." *See* Dkt. 26-3; *see* Compl. ¶ 60. Unlike Plaintiffs' video, SGA's skit actually included the mimed use of a deadly weapon. *Id.* The fact that SGA's video did not incidentally feature Muslim or Palestinian imagery, promote a Muslim group event, or cause Islamophobic hysteria does not color SGA's conduct differently than Plaintiff's conduct. *See* Dkt. 26-2 at 1. Thus, SGA is a relevant comparator.

*3. Comparators' race and religion*

Defendants claim that Plaintiffs' Complaint does not directly allege the race and religions of the individuals involved in ISA's and SGA's videos. Dkt. 26, at 10. This is not true. Plaintiffs repeatedly allege throughout the Complaint that they were treated differently than their non-Arab/Muslim counterparts because of their race and religion. Compl. ¶¶ 6, 142, 163, 165–66. The names of the organizational comparators fairly allege the differences between groups' perceived race and religion. Compl. ¶¶ 57, 60. Students in MSA can be reasonably perceived to be Muslim and Arab—or, relevantly here, Palestinian—where students in ISA or SGA are not subject to those perceptions. *Cf. Lee v. City of South Charleston*, No. 2:08-00289, 2009 WL 2602378 at *5 (S.D.W.V. Aug. 21, 2009) (permitting EP claim to proceed for discrimination based on a perceived characteristic). Thus, Plaintiffs have adequately alleged differential treatment based on a protected characteristic.

**B. Plaintiffs have alleged discriminatory intent.**

Plaintiffs have pled sufficient facts to plausibly allege that Defendants acted with discriminatory intent to punish them. Defendants' contention otherwise misconstrues and cherry-picks the Complaint. Equal protection requires a plaintiff to demonstrate that their differential

treatment was the result of intentional discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Reviewing courts look at the "historical background of the challenged policy," the specific sequence leading up to the events, departures from the normal procedural sequence, and administrative history. *Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 883 (4th Cir. 2023). Courts may also find that Defendants have adopted the discriminatory animus of the public. *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 824 (4th Cir. 1995). These facts are properly alleged here.

1. *Defendants' contemporaneous statements and actions during the investigation and disciplinary process demonstrate discriminatory intent.*

Despite Defendants' arguments otherwise, the sequence of events and contemporaneous statements made by Defendants show clear discriminatory motive. First, Plaintiffs were disciplined only after online outcry that Plaintiffs' clothing expressing their religion and racial identity made people "feel fearful and unsafe." *See* Dkt. 26-3 at 1. Defendants were aware that the video was part of a trend not intended as a threat to any person or community. *See* Dkt. 26-2 at 1. Defendant Mukai issued a statement acknowledging that all of the videos following the trend could be "traumatizing . . . to our Jewish students, staff, and community." Dkt. 26-2 at 1. Still, Defendants investigated and punished only MSA for its video. Compl. ¶¶ 105, 108, 120–135. The disciplinary action taken was substantively identical to the action called for by JCRC. *Id.* ¶ 125; *see infra* Part II.B.2.

During the investigation, Defendants made multiple statements and took multiple actions that strayed from the normal disciplinary process and made clear that Defendants were acting with an invidious motive. At the start of the investigation—Defendant Fawsett admitted that she had already decided to discipline the students but "was just looking for 'the proper code violation'" before the investigation was complete. Compl. ¶ 103.

Additionally, Defendants made direct comments showing discriminatory intent. When investigating a fabricated social media post, Defendant Mukai insisted that Plaintiff Roe praised ISIS online and supported a known terrorist even after police found the post to be fake. Compl. ¶¶ 115–

119. Defendants also described the historic map of Palestine as an "eliminationist message against all Jews"—a known Islamophobic and anti-Palestinian rhetorical device. *See* Compl. ¶124. In so doing, and in prohibiting Plaintiff Coe from wearing a sweatshirt representing his national origin and religious identity, Defendants adopted the known discriminatory intent of others. *See* Compl. ¶¶ 125, 130.

*2. Defendants adopted the discriminatory intent of the public opposition.*

As Defendants acknowledge in their motion to dismiss, state actors can adopt the discriminatory intent of the public. *See Sylvia Dev. Corp, Md.*, 48 F.3d at 824. Adoption can occur where public outcry was "overwhelmingly opposed to [Plaintiffs actions] for a distinct discriminatory reason, and the [decision makers] were swayed by that public opposition, fully aware of its basis in discrimination and prejudice." *Id.* Plaintiffs meet that threshold here.

Plaintiffs allege—and Defendants agree—that MSA's social media post sparked opposition. After the video was posted by a prominent right-wing influencer who had previously targeted "MSA and the expression of their identity," Compl. ¶¶ 82–84, an "online hate campaign" ensued against MSA. This campaign eventually led to several members of the FCPS community, including parents and the JCRC calling on Defendants to discipline Plaintiffs. Compl. ¶¶ 90, 92–93. The opposition focused entirely on the ethnic and religious expressions of the students who were in the video, leaving no doubt regarding their discriminatory intent. *See Sylvia Dev. Corp.*, 48 F.3d at 824. Ms. Nomani, who is known for her Islamophobic and anti-Palestinian content, immediately likened the video to terrorism—accusing MSA of reenacting a terror attack without any reference other than Plaintiffs' membership in a religious club and appearance. *See* Compl. ¶¶ 73, 82. Other community members called Plaintiffs "Muslim terrorists in training" and engaged in Islamophobic and xenophobic rhetoric such as calling for the student's deportation. Compl. ¶ 88 ("Deport, deport, deport.").

Defendants punished Plaintiffs because of this opposition with full knowledge of the discriminatory animus fueling the online campaign. During the interrogations of Plaintiffs, Defendants

disregarded Plaintiffs and their parents' insistence that they were simply following a trend and not depicting violence. *See* Compl. ¶¶ 98–102.[5] Still Defendants punished Plaintiffs using the exact rhetoric of the opposition and adopted the same discriminatory intent. *See* Compl. ¶¶ 107, 115–119, 125.

## III. Plaintiffs Properly Allege a Title VI Violation.

Plaintiffs' intentional discrimination claims succeed under Title VI for the same reasons described in the Equal Protection discussion above. Title VI proscribes "racial classifications that would violate the Equal Protection Clause." *Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003). Defendants disciplined students based on their racial identity and the expression of that identity, fueled by the racially charged community reaction to MSA's promotional video. *See supra* Part II.B. Because Plaintiffs have alleged intentional discrimination by Defendants based on their race, their Title VI claims should proceed to discovery. *See id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)).

## IV. Plaintiffs Properly Allege a Procedural Due Process Claim.

To succeed on their due process claim, Plaintiffs must establish 1) possession of a liberty or property interest protected by the Fourteenth Amendment, 2) deprivation of that interest by Defendant state actors, and 3) failure to provide constitutionally sufficient process. *See Doe v. Rector & Visitors of George Mason Univ.* (*GMU*), 149 F. Supp. 3d 602, 613 (E.D. Va. 2016); *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016).

As alleged, Defendants violated Plaintiffs' procedural due process rights by suspending Plaintiffs for seven days (one day out-of-school and six days in-school) and publicly defaming them without providing them with the "basic requirements" of due process. *Cardall*, 826 F.3d at 743; *Goss v. Lopez*, 419 U.S. 565, 576 (1975) ("Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation . . . is so insubstantial that suspensions may constitutionally

[5] Plaintiffs' Counsel also issued a letter to Defendants expressly describing the discriminatory nature of the opposition, specifically the anti-Arab and Islamophobic rhetoric driving it. Compl. ¶ 106.

be imposed by any procedure the school chooses."). Defendants' motion misstates the law and fails to properly rely on the facts as alleged.

**A. Plaintiffs have a property interest that was infringed by their suspensions.**

Students have a "legitimate entitlement to a public education as a property interest," and due process safeguards are required to protect students from "unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss*, 419 U.S. at 574; Compl. ¶ 192. Infringement of that interest must be greater than "de minimis," which is a holistic inquiry that includes consideration of the length of the suspension, the exclusion of the student from educational opportunities, the quality of alternative opportunities, and the impact on the student's life. *See Goss*, 419 U.S. at 576; *Laney v. Farley*, 501 F.3d 577, 583–84 (6th Cir. 2007) (finding that a "suspension of sufficient length or consequence," or that is offers "significantly different or inferior" educational opportunities, can trigger due process); *Marquez v. Mesa Vista Consol. Schs.*, No. CV O3-917, 2004 WL 7337820, at *3 (D.N.M. Aug. 31, 2004).

The Supreme Court in *Goss* recognized that students facing "temporary suspension," even for ten days or less, "have [property] interests qualifying for protection of the Due Process Clause." *Id.* at 581; *R.M.B. v. Bedford Cnty. (Virginia) Sch. Bd.*, 169 F. Supp. 3d 647, 655 (W.D. Va. 2016). Here, Plaintiffs allege six days of in-school suspension and one day of out-of-school suspension, thus falling within the protections guaranteed by *Goss*. Plaintiffs were called to the front office for questioning on Monday, October 27, Compl. ¶¶ 96–97, and held until their parents arrived before being sent home. *Id.* ¶ 100. That day, Plaintiffs faced the "total exclusion from the education process" that Defendants claim is necessary; *see* Dkt. 26 at 20; *Goss*, 419 U.S. at 576.

But more, Plaintiffs allege six additional days of in-school suspension that further infringed on their property interest. Defendants held Plaintiffs in a small, windowless room from 8:00AM to

4:00PM, on October 28-30. Compl. ¶¶ 108–14.[6] Plaintiffs were formally sanctioned and held under the same conditions for three more days—October 31 and November 5-6.[7] *Id.* ¶ 121, 132–33.

Defendants seek to dismiss Plaintiffs' claim by suggesting that "in-school" suspensions are categorically without due process rights. That is incorrect—and where applicable, the caselaw favors Plaintiffs' claims. While courts are hesitant to extend due process rights when alternative learning opportunities are available, they generally agree that such opportunities should not be "materially inferior." *See Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185, 216 (E.D.N.Y. 2018); *Cole v. Newton Special Mun. Separate Sch. Dist.*, 676 F.Supp. 749, 751–52 (S.D. Miss. 1987) ("Under certain circumstances, in-school isolation could well constitute as much deprivation of education as at-home suspension."). Defendants cite, for example, *Laney v. Farley*, where the Sixth Circuit found that its student was not denied educational opportunities during a one-day in-school suspension, where another student in similar circumstances "completed all his assigned work . . . and did not fall behind." 501 F.3d at 579, 582 (citing *Wise*, 855 F.2d at 566). The *Laney* court further observed that "[a]n in-school suspension *could*, but does not necessarily, deprive a student of educational opportunities in the same way an out-of-school suspension would." *Id.* at 581.[8]

---

[6] Plaintiffs are aware of an error the Complaint. The first day of in-school suspension was Tuesday, Compl. ¶ 108, and then Plaintiffs were "also" suspended pending the conclusion of the school's investigation for two more days—Wednesday and Thursday, not Tuesday and Wednesday. *See id.* ¶ 114.

[7] Here again, Plaintiffs are aware of an error in the Complaint. Following the three-day investigation, Plaintiffs were suspended "from October 30, 2025 thru November 6, 2025." Dkt. 26-3. Plaintiffs understand that Nov. 3 and 4, 2025, were student holidays. Therefore, Plaintiffs' total suspension ran for six days, not eight. *See* Compl. ¶¶ 121, 195.

[8] Defendants other cited caselaw largely inapposite. *Mason v. Bd. of Education* is not a case of suspension at all. Instead, the district court reasoned that "an in-school *detention*" did not implicate the plaintiff's property interest because detention was "less onerous than an in-school *suspension*." No. 10-CV-3143, 2011 WL 89998, at *4 (D. Md. Jan. 11, 2011) (emphasis added). The Eighth Circuit in *Wise v. Pea Ridge Sch. Dist.* did not hear any procedural due process challenge, instead arguing in a *dicta* footnote that the appellant's three-day in-school suspension would theoretically warrant no protection. 855 F.2d 560, 562–3 & n.3 (8th Cir. 1988).

Here, students were not as fortunate as the student from *Laney*. As alleged, the so-called "Alternative Instructional Area" where Plaintiffs served their suspensions was so "materially inferior" to their classroom experience that it is fairly characterized as a "total exclusion" from the learning environment. Compl. ¶¶ 108, 110, 113, 132–35. Defendants gave Plaintiffs schoolwork to complete but, even after requesting help, confronting administrators, and attempting to meet with teachers, Plaintiffs received no academic instruction or assistance and were forbidden from speaking to each other. Compl. ¶¶ 110, 113, 133. As a result, unlike in *Laney*, Plaintiffs did "fall behind," 501 F.3d at 582, and "returned to their classes confused, behind on their assignments, and struggling to transition back into the learning environment." Compl. ¶¶ 134, 141.[9]

Because Defendants do not challenge Plaintiffs out-of-school suspension, and because their in-school suspension "deprive[d] [them] of educational opportunities in the same way an out-of-school suspension would," *Laney*, 501 F.3d at 581, Plaintiffs were owed due process.

### B. Plaintiffs have a liberty interest in their reputations that was infringed by Defendants.

Independent of Plaintiffs' property interest, they have a protected liberty interest that is implicated when "reputational injury [is] accompanied by a state action that 'distinctly alters or extinguishes' a legal status." *GMU*, 149 F. Supp. 3d at 613 (quoting *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012)) (cleaned up). The "reputational injury" can arise from derogatory public statements alleging "serious character defects," *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308–09 (4th Cir. 2006), or, "coupled with the deprivation of a specific property right, disciplinary charges against students that could 'seriously damage the students' standing with their fellow pupils

[9] *See also* Compl. ¶¶ 148 (Roe's grade point average dropped from a perfect 4.0 to a 3.5 as a result of poor performance on assignments during suspension), 153 & 155 (John Doe and Coe missed several assignments for lack of instructional support and their grades also dropped significantly), 157 (Jane Doe required several weeks to make up missed assignments, and missed exams and quizzes she could not retake).

and their teachers as well as interfere with later opportunities for higher education and employment.'" *M.B. by & through Brown v. McGee*, No. 3:16CV334, 2017 WL 1364214 (E.D. Va. Mar. 24, 2017). Plaintiffs properly allege both.

Defendants have not disputed that calling a community-wide email calling Plaintiffs' video an act of "antisemitism" was a stigmatizing publication within the meaning of a "stigma-plus" claim. *See* Dkt. 26 at 23–25; Compl. ¶¶ 107, 131, 194. Defendants also fail to dispute that Plaintiffs' suspensions damaged their reputations causing Plaintiffs to lose extracurricular, higher education, and possibly career opportunities. *Id.* ¶ 196; *see GMU*, 149 F. Supp. 3d at 613 ("[A] reputational injury is "actionable if there is even 'a likelihood that prospective employers or members of the public [will] see the damaging information.'" (quoting *Sciolino v. City of Newport News*, 480 F.3d 642, 650 (4th Cir. 2007))).[10]

Instead, Defendants mistakenly claim that Plaintiffs failed to satisfy two "stigma-plus" requirements. First, Defendants argue that Plaintiffs failed to allege a request for a "name-clearing hearing." Dkt. 26 at 23–24.[11] Defendants call for, at most, an allegation that Plaintiffs demanded due process. They did. Plaintiffs allege that Defendants pre-judged the students to be guilty before the students and parents spoke with Defendant Fawsett. *Id.* ¶ 103. Rebecca Roe attempted to speak with Defendant Mukai and was denied. Compl. ¶ 102. Plaintiffs then appealed the school's decision to FCPS but received no meeting with FCPS decisionmakers. Compl. ¶¶ 136–39; Exhibit A – Plaintiffs' Complaint to the District; *see Ridpath*, 447 F.3d at 312–13.[12]

---

[10] *See also* Compl. ¶¶ 149, 151, 152 (Roe's suspension requires a Counselor Note with every transcript sent to an institute of higher learning, and resulted in the loss of a letter of recommendation and a senior internship program opportunity); *id.* ¶ 154 (John Doe's suspension is suspected of causing his university rejections); *id.* ¶ 158 (Jane Doe anticipates the same difficulties as John Doe).

[11] But of Defendants' cases controlling on this Court, all but one are employment cases and, in every case, the plaintiffs are adults. *See id.* at 23–24 & n.9. Plaintiffs reject an extension of this so-called "requirement" to secondary-school students and children.

[12] Exhibit A is an email thread showing Plaintiffs' "formal complaint" to FCPS. In the interest of parity, as Defendants have included exhibits of documents referenced in the Complaint, the Court should consider the exhibit and note that Plaintiff Parents demanded an "immediate meeting" to

Second, Defendants argue that Plaintiffs needed to allege that their "stigma" and "plus" originated from not merely one government entity (e.g., TJHSST or FCPS), but one *individual* person within the sued entity. Dkt. 26 at 24–25. Defendants cite no caselaw for this proposition—and cannot, because it would detonate "stigma-plus" precedent. *See, e.g.*, *Sciolino*, 480 F.3d (denying dismissal of "stigma-plus" claim against city and police chief, although neither individual defendant literally placed the stigmatizing statements in plaintiff's personnel file). Indeed, the only case Defendants cite stands for the exact opposite of what they claim. *See Velez v. Levy*, 401 F.3d 75, 88–89 & n.12 (2d Cir. 2005). Moreover, even if the same individual person needed to be involved in both acts, Plaintiffs expressly allege that Mukai and Reid played important roles in the decision to discipline Plaintiffs. *See* Compl. ¶¶ 13, 97–98, 103, 120–21.[13] That is sufficient to overcome Defendants' responsibility shell game. Accordingly, Plaintiffs have properly asserted an infringed liberty interest.

**C. Plaintiffs properly allege that they did not receive basic due process.**

Having established qualifying liberty or property interests, a student has due process rights to, at least, "oral or written notice of the charges against him[,] . . . an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581. Here, Plaintiffs deserved "[a]n opportunity to clear [their] name[s]" *before* their reputations were "ruined by dissemination of false, stigmatizing charges" and before they were denied access to their education. *Id.*; *Sciolino*, 480 F.3d at 652–53.

First, Plaintiffs did not receive adequate notice of all evidence against them. *See Goss*, 419 U.S. at 581. Plaintiffs allege that Defendants "relied on statements or beliefs of third-party groups"—evidence of which Plaintiffs' were not aware. Compl. ¶ 199. For example, despite citing Plaintiff Coe's

---

address "specific actions taken by TJHSST administrators and staff" and "[t]he superintendent's premature and biased public comments." Ex. A at pdf5.

[13] These allegations have been corroborated by JCRC. *See* Schwartz, *supra* note 3.

sweatshirt as evidence of Plaintiff's policy violation, no Defendant *ever* brought that evidence to Plaintiffs' attention before issuing sanctions. Compl. ¶¶ 124, 126.[14]

Second, Plaintiffs further allege that they had no meaningful opportunity for a hearing because Defendant Fawsett arrived at her meeting with students and parents having already decided to punish Plaintiffs and was "just looking for 'the proper code violation." Compl. ¶ 103; *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985). On this allegation, Defendants point to *Doe v. Fairfax County School Board*, where this Court held that "'a plaintiff must overcome a presumption of honesty and integrity on the part of decision-makers' and show that the 'adjudicator has prejudged, or reasonably appears to have prejudged, an issue.'" 403 F. Supp. 3d at 521; Dkt. 26 at 22. But Plaintiffs allege express statements, indicating that Defendant Fawsett "prejudged" Plaintiffs' guilt, overcoming the standard "presumption." Plaintiffs further point to Defendant Mukai's public statement that the video was "antisemitic" as evidence of the same. Compl. ¶ 194.

Defendants further argue that Defendant Fawsett was still open to changing her mind because she also said she would "look into the[] other videos and groups." Compl. ¶ 104; Dkt. 26 at 22. But Fawsett's statements never directly contradict Plaintiffs' prejudgment allegation, and Defendants' own alternative interpretation bears no weight in a motion to dismiss. Defendants dig deeper to argue that Fawsett "ma[king] up her mind" before hearing from Plaintiffs "would not have been unfair," because she had already seen some evidence. That is categorically incorrect. "[S]ome opportunity . . . to present [Plaintiffs'] side of the case is recurringly of obvious value in reaching an accurate decision," which is why Plaintiffs were owed a "meaningful" hearing before the decision is reached. *See Loudermill*, 470 U.S. at 543. Defendants were obligated to withhold judgment for a just a moment longer and failed

[14] Meanwhile, JCRC made public comments publicly about Plaintiff Coe's shirt, and bragged about contacting Defendants on Sunday night, before any meeting with Plaintiffs could have taken place. Compl. ¶¶ 89, 125; Schwartz, *supra* note 3.

to do so.

On the same theme, Plaintiffs properly allege that Defendant Mukai stigmatized their reputations before they had any opportunity to clear their names. *Sciolino*, 480 F.3d 652–53. Defendants do not discredit Plaintiffs' allegation that Defendant Mukai took it upon himself to "disseminat[e] . . . false, stigmatizing charges" against Plaintiffs prior to *any* notice or hearing, contravening the Fourth Circuit's "stigma-plus" caselaw. *Id.* Instead, Defendants merely claim that Mukai was uninvolved in the suspension, which Plaintiffs have already established to be a misunderstanding of "stigma-plus" precedent and an inappropriate conclusion of fact. *See Supra*, Section IV.B.

## V. Defendants Reid and Mukai Were Personally Involved in the Deprivation of Plaintiffs' Rights.

Both Superintendent Reid and Principal Mukai had sufficient personal involvement in the disciplinary decisions to support individual-capacity liability. To establish personal liability under § 1983, Plaintiffs only need to plausibly plead "that the official charged acted personally in the deprivation of the plaintiff's rights." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018); *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Plaintiffs have plausibly alleged that both Mukai and Reid were personally involved in the deprivation of Plaintiffs' rights.

For Principal Mukai, Defendants seek to treat Mukai's pre-investigation letter to the community deeming Plaintiffs "antisemitic" as separate from Plaintiffs claims. It is not. First, as discussed *supra* Section IV.C, Mukai's derogatory description of Plaintiffs supports their due process claim. Second, and as Plaintiffs make clear in the Complaint, Mukai's letter shows that he and other TJHSST decisionmakers "predetermined that Plaintiffs had violated policy." Compl. ¶ 198. These facts and the plausible allegation that Mukai, as principal, is "responsible for enforcing student discipline" combine to establish his personal involvement in the challenged action.

For Superintendent Reid, Defendants aver that "Plaintiffs offer only a conclusory assertion"

that Reid was involved, Dkt. 26 at 27, but Plaintiffs allegations are more than that. The allegation that Reid "reviewed and approved the disciplinary actions and speech restrictions" plausibly alleges her involvement in light of FCPS' review and subsequent approval of Plaintiffs' punishment. Compl. ¶¶ 136–39. Far from "threadbare," these facts give rise to the plausible assertion that Reid was personally involved in the challenged actions.

## VI. FCPS Ratified the Unconstitutional Acts Taken Against Plaintiffs and is Liable as a Municipality Under *Monell.*

FCPS is liable under *Monell.* Monell permits lawsuits against a municipality[15] when the municipality "undertook the allegedly unconstitutional action pursuant to an 'official policy' or custom." *Starbuck v. Williamsburg James City Sch. Bd.*, 28 F.4th 529, 532-33 (4th Cir. 2022) (quoting *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978)). A municipality can be liable under *Monell* through, inter alia, "the decisions of a person with final policymaking authority." *Id.* at 533. *Monell* explains that liability attaches to a municipality when the alleged unconstitutional action "implements or executes … a decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.

Defendants ignore controlling precedent in arguing that the Fairfax County School Board cannot be liable under *Monell.* While Defendants correctly explain that a local governing entity cannot be liable under a *respondeat superior* theory, see Dkt. 26 at 29, ratification alone gives rise to *Monell* liability. *See Starbuck*, 28 F.4th at 534 (ratification "holds the municipality liable for *its own decision* to uphold the actions of subordinates") (emphasis original)). Far from conclusory, Plaintiffs allege that they (1) filed a formal complaint with the School Board about the adverse actions taken against them, Dkt. 8-1 ¶ 136; (2) received a response from the School Board that the complaint would be investigated, *id.* ¶ 137; (3) received a letter from the School Board finding no wrongdoing and that

[15] School boards in Virginia are treated as municipalities. *See Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 522 n.3 (4th Cir. 2000).

"the administration's actions were consistent with [School Board] regulations." *Id.* ¶¶ 138–39. These allegations plausibly establish that the School Board considered and affirmatively adopted the administrators' unconstitutional actions. *Monell* provides that such ratification—not mere *respondeat superior*—gives rise to municipal liability.

**VII. Defendants are not Entitled to Qualified Immunity.**

The individual-capacity Defendants are not entitled to qualified immunity because clearly established law put them on notice that their conduct violated Plaintiffs' constitutional rights. Defendants "carry the burden of demonstrating qualified immunity." *Hammock*, 146 F.4th at 364. It is "rare" for Defendants to establish qualified immunity on a motion to dismiss because "plaintiffs 'must present only a claim that is plausible on its face.'" *Nichols v. Bumgarner*, 173 F.4th 511, 523–24 (4th Cir. 2026) (quoting *Riddick v. Barber*, 109 F.4th 639, 650 n.5 (4th Cir. 2024) (internal quotations omitted). For that reason, "qualified immunity is typically 'best addressed at the summary judgment stage after the facts have been developed through discovery." *Id.*

While Defendants correctly point out that clearly established law cannot be defined "at a high level of generality," Dkt. 26 at 8, "[a] 'general constitutional rule … may apply with obvious clarity … even though the very action in question has not previously been held unlawful.'" *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Here, each of the constitutional principles is clear.

Defendants' rest their qualified immunity defense to Plaintiffs' First Amendment claims on a single case that discusses the doctrine only in broad strokes and at the summary judgment stage. *See* Dkt. 26 at 28–29 (citing *Abbott v. Pastides*, 900 F.3d 160, 174 (4th Cir. 2018)). But it is "beyond debate" that relying solely on outside reaction to punish speech, as the Complaint alleges, does not amount to a substantial disruption. Courts in the Fourth Circuit have declined to extend qualified immunity to educators when no substantial disruption is alleged. *See, e.g., Heward v. Bd. of Educ. of Anne Arundel*

*County*, 2023 WL 6381498 at *47 (D. Md. Sept. 29, 2023) (finding qualified immunity inappropriate where plaintiffs plausibly alleged a restriction on speech that "does not substantially disrupt the school environment or pose serious risk of substantial disruption.")). Accepting the allegations as true, Defendants punished Plaintiffs for protected speech that neither caused nor threatened any substantial disruption. They are therefore not entitled to qualified immunity on Plaintiffs' First Amendment claims.

Further, Defendant Fawsett punished Plaintiffs because of their religion, race, and national origin which is unconstitutional "beyond debate." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). It is well established that punishing students more harshly because of their race or religion violates Equal Protection. *See Heyward*, 711 F.3d at 444 (finding no Equal Protection violation where there was no disparity in punishment based on race); *Heyne v. Metro. Nashville. Pub. Sch.*, 655 F.3d 556, 570–71 (6th Cir. 2011) (citing *McLaurin v. Oklahoma St. Regents for Higher Educ.*, 339 U.S. 637, 642 (1950)). Likewise, as Defendants recognize, it is well established that a state actor can adopt the discriminatory animus of members of the public in violation of Equal Protection. *Sylvia Dev. Corp.*, 48 F.3d at 819. This is precisely what Fawsett did. Plaintiffs do not allege that they were punished because of public impact, but that they were punished more harshly than their peers because of their race, religion and national origin—which fundamentally violates Equal Protection.

Finally, the due process protections that Defendants failed to provide are neither novel nor abstract, nor are the property or liberty interests at issue in this case unfamiliar to the Court. *See supra* at section V. Accordingly, Defendants violated clearly established due process rights and are not entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety.

August 24, 2026

Respectfully submitted,

/s/ Lena Masri
Lena Masri
ldf@cair.com
Gadeir Abbas*
gabbas@cair.com
Ahmad Kaki
akaki@cair.com
Catherine Keck^
John M. Fossum**
jfossum@cair.com

**CAIR LEGAL DEFENSE FUND**

453 New Jersey Ave, SE
Washington, D.C. 20003
Tel: (202) 742-6420
Fax: (202) 488-08

**licensed in VA, not in DC, limited to federal practice*
***notice of appearance forthcoming*
*^pro hac vice application forthcoming*

*Counsel for Plaintiffs*